## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE LAWFARE INSTITUTE,<br>    P.O. Box 33226,<br>    Washington, D.C. 20033-3226,<br><br>            *Plaintiff*,<br><br>        v.<br><br>UNITED STATES DEPARTMENT OF<br>STATE,<br>    2201 C Street N.W.,<br>    Washington, D.C. 20520, *and*<br><br>MARCO RUBIO, in his official capacity as<br>Secretary of State,<br>    2201 C Street N.W.,<br>    Washington, D.C. 20520,<br><br>            *Defendants*. | Case No. 26-cv-798 |

## <u>COMPLAINT</u>

1.      Presidents and their administrations have long made international agreements outside of the Article II treaty process. Each year, they have, without seeking the Advice and Consent of the Senate or making any submissions to Congress, committed the country to hundreds of binding and non-binding compacts, alliances, and other arrangements with various nations, on matters ranging from defense to law enforcement to trade.

2.      Over time, these international agreements have become an increasingly important part of how the executive branch conducts foreign affairs. Today, the agreements are essential components of the executive branch's foreign policy toolbox. They supply the nuts and bolts that administrations use to facilitate routine security, scientific, and other cooperation, as well as the wrenches and drills that administrations use to shape the terms of U.S. engagement on global and regional issues of the day.

3.    President Donald J. Trump and his administration are no exception. Throughout his first year back in office, he and his administration have touted specific "historic" agreements between the United States and countries across the world,[1] and they have boasted in general about the tremendous deals they are making and will continue to make to strengthen the country's security and prosperity.[2]

4.    Federal law guarantees the American people transparency into these deals, so that they can, for themselves, learn about and evaluate the bargain that is being struck in their name. For decades, federal law has required the Department of State ("State Department," or "the Department") to regularly disclose the text of certain binding international agreements to the public and report this information and additional information to Congress.

5.    In December 2022, Congress greatly strengthened these transparency obligations by amending the Case-Zablocki Act, also known as the Case Act, as part of a bipartisan and robust legislative process with extensive interbranch review.

6.    Through the amended Case Act, 1 U.S.C. § 112b, Congress has required the State Department to publish on the agency's website (1) the text of most binding and non-binding international agreements, and (2) detailed descriptions of and specific citations to the underlying legal authorities for these agreements. For each covered agreement, Congress has required the text and authority information to be posted within 120 days of the agreement's effective date.

7.    In the first two years following the Act's amendment, the Department made monthly postings of agreement text and legal authority information to its Case Act websites. In so

---

[1] *See, e.g.*, The White House, *Fact Sheet: President Donald J. Trump Secures Historic $1.2 Trillion Economic Commitment in Qatar* (May 14, 2025), https://perma.cc/X37K-X6AX.

[2] *See, e.g.*, President Donald J. Trump, *National Security Strategy of the United States of America* 19 (Nov. 2025), https://perma.cc/7Z64-W5RX [hereinafter *National Security Strategy*] (discussing Indo-Pacific agreements); U.S. Sec'y of State Marco Rubio, *100 Days of an America First State Department* (Apr. 30, 2025), https://perma.cc/4MG7-6LGN (discussing agreements for the removal of aliens from the United States to regional allies in Latin America); *Read the Full Transcript of Donald Trump's '100 Days' Interview With TIME*, TIME (Apr. 25, 2025), https://time.com/7280114/donald-trump-2025-interview-transcript/ [hereinafter *Time Interview*] (discussing trade deals).

doing, the Department shed critical light on the federal government's various dealings with countries around the world, on matters big and small—from aiding Ukraine against Russian aggression to working with the Dominican Republic on livestock vaccination.

8.      But since President Trump took office more than a year ago, the State Department and Secretary of State Marco Rubio ("Defendants") have largely disregarded their Case Act obligations. They have refused to post covered agreement text and authority information on the Case Act websites for many months on end, leaving the American people in the dark about what deals are being made on their behalf and the basic details of those deals.

9.      In particular, Defendants have refused to post text and authority information for several significant agreements on marquee foreign policy issues for the Trump administration: deportation of foreign nationals to Latin America, economic and defense partnerships in the Middle East, and trade with various allies.[3] They have, for example, refused to post the text and accompanying authority information for February 2025 agreements with both Costa Rica and Panama to accept third-country nationals deported from the United States; February/March 2025 agreements with El Salvador to detain Venezuelan Tren de Aragua ("TdA") gang members deported from the United States and to return Salvadoran MS-13 gang members in U.S. custody; May 2025 agreements with both Saudi Arabia and Qatar for defense sales and investments worth tens of billions of dollars; a May 2025 agreement with Ukraine to implement the joint reconstruction investment fund on critical minerals; and trade deals throughout 2025 with, among others, the European Union and the Philippines.

---

[3] *See, e.g.*, *National Security Strategy*, *supra* n.2, at 3, 10, 13, 16, 22, 28 (discussing rebalancing trade relationships, controlling immigration system, and ramping up Middle East defense and economic partnership as key Trump administration national security objectives); *Protecting the American People Against Invasion*, Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025) (discussing Trump administration's views on the need to enforce immigration laws and facilitate efficient and expedited removal of aliens from the United States); *Assuring the Security of the State of Qatar*, Exec. Order No. 14,353, 90 Fed. Reg. 48143 (Sept. 29, 2025) (discussing Trump administration's views on the importance of Qatar alliance and security guarantee for peace, stability, and prosperity in the Middle East and abroad); *America First Trade Policy*, 90 Fed. Reg. 8471 (Jan. 30, 2025) (discussing trade).

10.     Defendants have also refused to post text and authority information for a range of other, more routine agreements—governing, among other things, deliveries of Rio Grande water from Mexico, civil nuclear cooperation with Thailand, and U.S. commercial space launches in Sweden. More than a year into the second Trump administration, Defendants have made only sporadic postings to the Case Act websites, leaving gaping holes in the public's understanding of foreign dealmaking.

11.     Defendants' conduct plainly violates the amended Case Act's terms. And it subverts the Act's purpose. Congress passed the Act and amended it to ensure broad transparency and accountability—to afford the public "greater understanding of the use of international accords as a foreign policy tool," which is "essential to our democracy" and "will lead to a stronger and more sustainable foreign policy."[4] It specifically sought to prevent the executive branch from doing what it is now doing—concluding agreements on behalf of the American people in secret.

12.     For similar reasons, Defendants' conduct violates the Paperwork Reduction Act ("PRA"), because they have failed to ensure timely and equitable access to the agency's public information.

13.     Plaintiff brings this suit to (1) challenge Defendants' unlawful decision to abandon these statutory obligations and withhold Case Act-covered agreement text and legal authority information from the State Department's international agreements websites, and (2) compel Defendants to comply with their clear, nondiscretionary duty to publish this information on the websites. Defendants' conduct has greatly harmed Plaintiff—a nonprofit media organization that educates the public about the federal government's operations and activities and informs public debate about foreign affairs and foreign policy—by depriving it of basic international agreement information guaranteed to it by law.

---

[4] S. Comm. on Foreign Relations, 117th Cong. 2d Sess., *Enhancing Transparency on International Agreements and Non-Binding Instruments* 5 (Comm. Print 2022), https://perma.cc/4EXZ-BV9R [hereinafter SFRC Rep.] (report on December 2022 Case Act amendment via section 5947 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023, H.R. 7776).

14.     Accordingly, Plaintiff challenges Defendants' actions under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706(1), (2)(A), and, alternatively, it seeks mandamus relief. It respectfully requests that the Court declare unlawful, vacate, and set aside Defendants' actions, and that the Court order Defendants to timely post all missing Case Act information and continue to post required information on a going-forward basis.

## JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the APA, 5 U.S.C. § 701 *et seq*., and alternatively under 28 U.S.C. § 1361 because Plaintiff seeks a writ of mandamus to compel an officer of the United States and an agency to perform duties owed to Plaintiff and required under law. This Court may grant declaratory relief, injunctive relief, mandamus relief, and other appropriate relief pursuant to 28 U.S.C. §§ 1361, 1651, 2201-02, and 5 U.S.C. § 706.

16.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Defendants reside in this district; a substantial part of the events or omissions giving rise to the claim occurred within this district; and Plaintiff resides in this district.

## PARTIES

17.     Plaintiff The Lawfare Institute is a 501(c)(3) non-profit education organization that publishes *Lawfare*, an online multimedia publication that is dedicated to informing public understanding of the operations and activities of the federal government, particularly as they relate to national security law and policy.

18.     Through *Lawfare* and associated podcasts and livestreams, The Lawfare Institute provides non-partisan and timely analysis of thorny legal and policy issues through written, audio, and other content, and it aims to do so in a fashion that is useful to policymakers and practitioners and also accessible to the general public. It produces academic-quality analysis with magazine-level readability at the pace of news to enable informed government policy, fact-based decision-making, and an engaged citizenry. *Lawfare*'s areas of coverage include national security law, threats to democracy, cybersecurity, executive powers, content moderation, domestic extremism,

and foreign policy, among many others; as part of its analysis in these areas, it has specifically covered and drawn upon international agreements.

19.    *Lawfare* is composed of an in-house team of editors and correspondents, as well as an array of regular contributors ranging from current and former government officials to journalists, practicing lawyers, academics, and other experts.[5] In their work providing analysis on issue areas ranging from executive powers to foreign policy, the *Lawfare* team and its contributors have relied upon and covered international agreements.

20.    The Lawfare Institute is headquartered in Washington, D.C., and its leadership and members of its in-house team reside there as well.

21.    Defendant U.S. Department of State is a cabinet-level department of the United States federal government, headquartered in Washington, D.C. It is responsible for foreign affairs and diplomacy, including treaties and other international agreements. Various State Department offices and bureaus have responsibilities related to international agreements and requirements pertaining to them, including the Office of the Legal Adviser (and within it the Office of Treaty Affairs and Office of Consular Affairs), the Bureau of Administration, and the Bureau of Legislative Affairs.[6]

22.    Defendant Marco Rubio is the Secretary of the U.S. Department of State and is sued in his official capacity.

---

[5] *See, e.g.*, *Masthead*, Lawfare, https://www.lawfaremedia.org/about/masthead; *About Lawfare*, Lawfare, https://www.lawfaremedia.org/about/about-lawfare.

[6] *See* U.S. Dep't of State, *Treaty Procedures*, https://perma.cc/89FT-KSYQ (describing role of Office of Treaty Affairs, within the Office of the Legal Adviser, in fulfilling Case Act requirements); 22 C.F.R. pt. 181 (similar with respect to several State Department offices and bureaus); U.S. Dep't of State, *Other Legal Adviser Offices*, https://perma.cc/QMN2-5DRN (describing the role of various Legal Adviser offices with respect to international agreements); *see also* U.S. Dep't of State, 1 Foreign Affairs Manual § 241.3(14)(l)(ii), https://perma.cc/6ABU-XEZX (delegating responsibility for Case Act compliance from Secretary to the Legal Adviser). The Department's organization chart as of August 2025 is available at https://perma.cc/35GA-9EBZ.

## LEGAL BACKGROUND

### Administrative Procedure Act (APA)

23.     The APA provides that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

24.     The term "agency action" includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13).

25.     A court reviewing a claim under 5 U.S.C. § 702 "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id.* § 706. The reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." *Id.* §§ 706(1), (2)(A).

### Paperwork Reduction Act (PRA)

26.     Congress enacted the PRA to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government" and "provide for the dissemination of public information on a timely basis, on equitable terms, and in a manner that promotes the utility of the information to the public and makes effective use of information technology." 44 U.S.C. §§ 3501(2), (7).

27.     To accomplish those goals, the PRA mandates that every agency must "ensure that the public has timely and equitable access to the agency's public information," *id.* §§ 3506(d)(1), and it defines "[p]ublic information" broadly to include "any information regardless of form or format, that an agency discloses, disseminates, or makes available to the public," *id.* § 3502(12). The Act further mandates that agencies must "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products." *Id.* § 3506(d)(3).

28.    Government-wide guidelines issued by the Office of Management and Budget state that the term "information dissemination product" includes "any electronic document … or web page" that an agency disseminates to the public. *Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies*; Republication, 67 Fed. Reg. 8452, 8460 (Feb. 22, 2002).

**Laws Governing International Agreements**

29.    Article II of the U.S. Constitution states that the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." U.S. Const. art. II, § 2, cl. 2. For years, presidents have increasingly declined to exercise this Article II treaty power.[7] But this decline does not mean that presidents have stopped making international agreements between the United States and other countries; they simply have made them outside of the Article II treaty process, through binding and non-binding international agreements.[8]

Binding Agreements

30.    From the early days of our nation, presidents have made executive agreements, binding the country under international law based not on their treaty power but instead on authorization in existing statutes or treaties or on some Article II authority.[9] Since the 1930s, these binding executive agreements have far outnumbered Article II treaties; between 1939 and 2012,

---

[7] *See, e.g.*, Curtis A. Bradley & Jack L. Goldsmith, *Presidential Control over International Law*, 131 Harv. L. Rev. 1201, 1204, 1209-12 (2018), https://perma.cc/SQ32-826M; Curtis Bradley, Oona Hathaway & Jack Goldsmith, *The Death of Article II Treaties?*, Lawfare (Dec. 13, 2018), https://perma.cc/T5MN-SDTP; Oona A. Hathaway, *Treaties' End: The Past, Present, and Future of International Lawmaking in the United States*, 117 Yale L.J. 1236, 1287-88 (2008), https://perma.cc/J9Z8-UTQ6.

[8] *See, e.g.*, Stephen P. Mulligan, *International Law and Agreements: Their Effect upon U.S. Law*, Cong. Rsch. Serv. (July 13, 2023), https://www.congress.gov/crs-product/RL32528#_Toc150859 006.

[9] *See, e.g.*, Oona A. Hathaway, Curtis A. Bradley & Jack L. Goldsmith, *The Failed Transparency Regime for Executive Agreements: An Empirical and Normative Analysis*, 134 Harv. L. Rev. 629, 638-45 (2020), https://perma.cc/H5YB-P6SP [hereinafter *Transparency Regime*]; Hathaway, *supra* n.7, at 1289-92.

for example, approximately 94% of 18,257 known international agreements that presidents entered into were executive agreements rather than treaties.[10]

31.    Nearly all these executive agreements are made without meaningful interbranch collaboration. Although a very small percentage are akin to treaties because they are submitted to Congress (rather than the Senate) for review and approval by majority vote (rather than two-thirds vote), the vast majority are made by presidents alone.[11] Typically, presidents exercise power under statutes that were enacted "many years" prior, offer vague and open-ended guidance, and give "broad discretion" and ex-ante authority to "negotiate, conclude, and ratify [international agreements] without ever returning to Congress for its review," and sometimes presidents exercise their own constitutional authority or authority from existing treaties.[12] In many instances, the statutory authorizations for these executive agreements are "extremely broad" and nebulous, and many "have not obviously authorized the making of international agreements at all, even in broad terms."[13]

32.    The rise of executive agreements means that presidents increasingly are exercising unilateral power to make legally binding deals and other arrangements and commitments with various nations—and, in so doing, carrying out significant U.S. diplomatic relations and foreign policy—"before Congress or the public even knows of [their] existence."[14]

33.    In recent decades, presidents have entered into hundreds of executive agreements each year, on subjects ranging from defense to trade to scientific cooperation.[15] Many "involve

---

[10] Bradley & Goldsmith, *supra* n.7, at 1210; *see also* Hathaway, *supra* n.7, at 1288; Cong. Rsch. Serv., 106th Cong., *Treaties and Other International Agreements: The Role of the United States Senate* 39 (Comm. Print 2001), https://perma.cc/75QB-PNDE [hereinafter CRS Study].

[11] *See, e.g.*, Bradley & Goldsmith, *supra* n.7, at 1212-15.

[12] *Id.* at 1213; *see id.* at 1214-15.

[13] *Id.* at 1215 (first quoting Oona A. Hathaway, *Presidential Power over International Law: Restoring the Balance*, 119 Yale L.J. 140, 145 (2009) [hereinafter *Presidential Power*]).

[14] *Transparency Regime*, *supra* n.9, at 633.

[15] *See, e.g., id.* at 666, 674; *Presidential Power*, *supra* n.13, at 150-53.

minor or routine commitments," but many are "quite consequential"[16]—"address[ing] issues that are significant to large numbers of Americans and might have been the subject of close congressional scrutiny had they been made public before they entered into force."[17] For instance, they have "involv[ed] matters such as security arrangements and alliances, the stationing of troops abroad, outlays of foreign aid, arrangements for border security, free trade accords, and weapons programs," all of which are ever-salient issues for the public and Congress.[18]

<u>Non-Binding Agreements</u>

34.    In addition to binding executive agreements, presidents since the Founding have made non-binding international agreements with other nations.[19] Non-binding international agreements impose no obligation under international law, and violations of them therefore implicate no legal consequences.[20] "Nevertheless, these agreements may be considered morally binding by the parties, and the President may be making a type of national commitment when he enters one" or laying the foundation for a future binding agreement.[21]

35.    Despite their non-binding nature, non-binding international agreements increasingly have become a central part of U.S. diplomatic relations and foreign policy. Like their binding counterparts, non-binding international agreements have risen over time—there are now thousands of them, with presidents and executive branch agencies concluding hundreds each year.[22]

---

[16] *Transparency Regime*, *supra* n.9, at 632-33.

[17] *Presidential Power*, *supra* n.13, at 153.

[18] *Transparency Regime*, *supra* n.9, at 633.

[19] *See, e.g.*, Curtis A. Bradley, Jack L. Goldsmith & Oona A. Hathaway, *The Rise of Nonbinding International Agreements: An Empirical, Comparative, and Normative Analysis*, 90 U. Chi. L. Rev. 1281, 1293-94 (2023), https://perma.cc/83VN-MYZ9.

[20] *See, e.g.*, *id.* at 1290-91.

[21] CRS Study, *supra* n.10, at 23; *see The Rise of Nonbinding International Agreements*, *supra* n.19, at 1290-91.

[22] *See, e.g.*, *The Rise of Nonbinding International Agreements*, *supra* n.19, at 1329-31, 1333-34; *see also id.* at 1309-15 (explaining that the President and executive branch agencies may prefer entering nonbinding agreements over binding ones for several reasons, including because the former may be easier to negotiate).

36.     They too range in subject areas, also addressing matters like defense, trade, and energy.[23] And they too involve a variety of substantive commitments between nations—for example, for regulatory cooperation or information exchange—that range from the mundane to the significant.[24] On one end of the spectrum are routine agreements for collaborations on scientific research programs or law enforcement initiatives.[25] On the other end of the spectrum are momentous agreements like the 2015 Joint Comprehensive Plan of Action (the Iran nuclear deal), much of the 2016 Paris climate change agreement (to limit global temperature increases), the 2019 U.S.-Mexico Joint Declaration and Supplementary Agreement (to address migration issues at the southern border), and the 2020 Joint Declaration between the Islamic Republic of Afghanistan and the United States of America for Bringing Peace to Afghanistan (to withdraw U.S. troops).[26]

37.     Non-binding international agreements "are often identical in form and function to binding agreements," including because they address similar matters and commitments.[27] "[T]here is little reason to think that the average formal non-binding agreement is any less significant than the average binding executive agreement, and thus little reason on that ground to differentiate between the two in terms of Congress's and the public's need to know about their content."[28]

**Congressional Transparency Regime for Executive Agreements**

38.     Congress has responded to the rise of executive agreements by imposing general transparency obligations on the executive branch.[29] Congress has regulated the agreements not by requiring that they each be congressionally approved after negotiation, but instead by mandating disclosures to itself and the public after the agreements are concluded—relying on these

---

[23] *See, e.g.*, *id.* at 1331-32.

[24] *See, e.g., id.* at 1306, 1324.

[25] *See, e.g., id.* at 1306-07, 1324-25.

[26] *See, e.g., id.* at 1307-09; *Transparency Regime*, *supra* n.9, at 708; Bradley & Goldsmith, *supra* n.7, at 1219-20, 1251-52.

[27] *The Rise of Nonbinding International Agreements*, *supra* n.19, at 1362; *see id.* at 1351; CRS Study, *supra* n.10, at 24.

[28] *Id.* at 1351.

[29] *See, e.g.*, *Transparency Regime*, *supra* n.9, at 633-64, 645-57.

disclosures to ensure oversight and accountability after-the-fact.[30] Between the late nineteenth century and 2022, this transparency regime shed some light, but not complete light, on presidential lawmaking via executive agreements.

Public Disclosure

39.     First, in the Public Printing Act of 1895, Congress required the Secretary of State to publish at the end of each legislative year the *Statutes at Large*, including all laws and regulations passed by Congress as well as all conventions, treaties, proclamations, and executive resolutions.[31] "In practice," however, "a number of agreements escaped publication."[32]

40.     In 1950, after the Secretary of State no longer had responsibility for the *Statutes at Large*, Congress enacted another publication statute, codified as amended at 1 U.S.C. § 112a and still operative today, requiring the Secretary of State to put together for publication a yearly compilation of treaties as well as "all international agreements other than treaties to which the United States is a party that have been signed, proclaimed, or with reference to which any other final formality has been executed."[33]

41.     In 1994, however, Congress amended § 112a after the State Department had difficulty publishing agreements in a timely fashion.[34] Congress amended the statute to state that the Secretary of State could opt not to publish certain agreements if the Secretary determined that "the public interest in such agreements is insufficient to justify their publication," including if the "limited or specialized nature of the public interest in such agreements" can "adequately be satisfied by an alternative means."[35]

---

[30] *See, e.g.*, *id.*

[31] *See, e.g., id.* at 645.

[32] *Id.* (quoting CRS Study, *supra* n.10, at 210).

[33] *Id.* at 645-46 (quoting 1 U.S.C. § 112a).

[34] *See, e.g., id.* at 646 (citing CRS Study, *supra* n.10, at 211).

[35] *Id.* (citation omitted). State Department regulations implementing the amendment ultimately provided for sixteen categories of agreements exempted from publication—primarily, bilateral agreements on specified subjects (like technical arrangements for postal administrations or military exercises), as well as classified agreements. *Id.* at 646-47.

42.    In 2004, Congress again amended § 112a to require the Secretary of State to make each treaty or international agreement required to be published available on a website "not later than 180 days after the date on which the treaty or agreement enters into force."[36] That website is the State Department's Treaties and Other International Acts Series ("TIAS") website.[37]

43.    The TIAS website included some, but nowhere close to all, of the binding international agreements made by the executive branch since the 1980s. As one recent empirical analysis concluded, "the publication of agreements by the government in TIAS is very far from comprehensive, perhaps because the executive branch, exercising its discretion under the relevant regulations, has concluded that a large percentage of agreements are not sufficiently important to be published. Whatever the reason," statistical evidence over a thirty-year period "indicate[s] that the government's current mechanism to publish international agreements results in significantly incomplete public access to the country's binding executive agreements."[38]

44.    During this period, TIAS also omitted non-binding international agreements because the State Department interpreted its transparency obligations as applying only to binding agreements. The regulations the agency adopted to implement its publication duties stated that "[d]ocuments intended to have political or moral weight, but not intended to be legally binding," do not qualify as covered "international agreements."[39] The regulations also exempted several additional categories of agreements, such as "[m]inor or trivial undertakings."[40]

<u>Congressional Reporting</u>

45.    In conjunction with imposing publication requirements, Congress also imposed congressional reporting requirements for international agreements. It did so in 1972 by enacting the Case-Zablocki Act, also known as the Case Act.[41]

---

[36] *Id.* at 647 (citation omitted).

[37] *Id.*

[38] *Transparency Regime*, *supra* n.9, at 688-89; *see also, e.g.*, *id.* at 647-48.

[39] *Id.* at 650 (citation omitted).

[40] *Id.* at 651 (citation omitted).

[41] Pub. L. No. 92-403, 86 Stat. 619 (1972) (codified as amended at 1 U.S.C. § 112b).

46.     Congress enacted the Case Act based on its growing concerns during the Vietnam War that the executive branch was concluding various executive agreements, including for military assistance, in secret, without congressional knowledge.[42] The Act also has its roots in earlier congressional efforts to ensure transparency and accountability, and to respond to the decades-long shift "in executive branch practice" away from conducting foreign policy and reaching accords through the Article II treaty process, which requires the Senate's advice and consent.[43]

47.     Through the Case Act, Congress addressed its transparency concerns by requiring the Secretary of State to transmit to it "any international agreement, other than a treaty, to which the United States is a party as soon as practicable after such agreement has entered into force with respect to the United States but in no event later than sixty days thereafter."[44] Congress explained that this 60-day congressional reporting requirement was expressly aimed at "dealing with the prior question of secrecy and of asserting the obligation of the executive to report its foreign commitments to Congress."[45] And it explained that the Act's aim was to help "restor[e] a proper working relationship between the Congress and the executive branch in the field of foreign affairs."[46]

48.     In the decades following the Case Act's enactment, Congress amended the Act several times in response to the late reporting and under-reporting of international agreements. For example, in the late 1970s, Congress amended the Act to require the President to annually submit a report detailing the agreements that had been transmitted late and the reasons for the late

---

[42] *See, e.g.*, *Transparency Regime*, *supra* n.9, at 649-50; *see also* CRS Study, *supra* n.10, at 213-17 (discussing Vietnam War era concerns and other motivations behind the Act).

[43] SFRC Rep., *supra* n.4, at 5.

[44] *Transparency Regime*, *supra* n.9, at 649 (citation omitted). A second provision of the Act provided that the agreements that the President determines should be classified would be transmitted not to Congress as a whole, but instead to the House Foreign Affairs Committee and the Senate Foreign Relations Committee, under an injunction of secrecy to be removed only upon notice from the President. *Id.*

[45] CRS Study, *supra* n.10, at 217 (citation omitted); *see also, e.g.*, *Transparency Regime*, *supra* n.9, at 649-50.

[46] CRS Study, *supra* n.10, at 217 (citation omitted).

transmittals.[47] In response to the State Department's explanations that late or incomplete transmittals were the result of inter-agency coordination issues—*i.e.*, other agencies not providing timely notice of agreements—Congress also amended the Act to consolidate within the executive branch the State Department's role in overseeing and coordinating international agreements. Congress required that any international agreement on behalf of the United States be transmitted to the State Department within 20 days, and it provided that no such agreement could be signed without prior consultation of the Secretary of State.[48]

49.     Despite these amendments, and others,[49] Case Act compliance issues persisted for decades. As one recent empirical analysis determined, "there has been systematic and consistent underreporting to Congress during much of the past three decades," with hundreds of agreements across different subject matters never being transmitted pursuant to the Case Act.[50]

50.     Moreover, the State Department did not transmit non-binding international agreements to Congress because it interpreted its Case Act obligations as applying only to binding agreements.

51.     The Department's Case Act regulations, first promulgated in 1981 pursuant to congressional instruction, exempted "[d]ocuments intended to have political or moral weight, but not intended to be legally binding."[51] (These regulations also implemented and applied to the publication statute discussed above.) They likewise carved out several other categories of agreements.[52]

52.     As a result, a number of "exceptionally important" agreements, including the 1996 Joint Declaration on Security Alliance with Japan and Afghan government assistance agreements

---

[47] *See, e.g.*, *id.* at 222-23; *Transparency Regime*, *supra* n.9, at 652.

[48] *See, e.g.*, CRS Study, *supra* n.10, at 222-23; *Transparency Regime*, *supra* n.9, at 651-52.

[49] *See, e.g.*, *Transparency Regime*, *supra* n.9, at 653-55.

[50] *Id.* at 676.

[51] *Id.* at 650 (citation omitted).

[52] *Id.* at 650-51.

totaling over $800 million,[53] went unreported to Congress. Congress instead had to rely on case-specific statutes to obtain access to particular non-binding agreements; the most prominent example is the Iran Nuclear Agreement Review Act of 2015 (Pub. L. No. 114–17), which ensured it access to the Iran nuclear deal.[54] Such case-specific statutes only gave Congress visibility into a fraction of non-binding agreements.[55]

53.     Finally, the underlying authority for the executive agreements the State Department did report was, at times, debatable or questionable.

54.     Since 1981, the State Department's Case Act regulations have required the agency to include with each transmitted agreement a "background statement" with "information explaining the agreement and a precise citation of legal authority."[56] The Case Act itself does not mandate a background statement; the agency adopted this requirement voluntarily to enable Congress to determine whether an agreement is "properly within the [executive branch's] authority."[57]

55.     For decades, the agency often, but not always, included with each transmitted agreement a one-page cover memorandum.[58] The memoranda included a brief explanation of the agreement and a section entitled "Legal Authority," which was usually very brief and contained a citation or string of citations to the U.S. Constitution, statutes (such as the Foreign Assistance Act of 1961 and the Arms Export Control Act), prior treaties, and other authorities.[59]

56.     A recent empirical analysis of over 5,000 cover memos transmitted from 1989 to 2017 showed that "less than half . . . cite an authority that gives the executive branch clear and express authority to conclude a binding international agreement," and "[a]lmost one-fifth . . . cite

---

[53] *Id.* at 672.

[54] *See* SFRC Rep., *supra* n.4, at 5-6.

[55] *See, e.g.*, *id.* at 6.

[56] *Transparency Regime*, *supra* n.9, at 650 (citation omitted).

[57] *Id.* at 635 n.12, 650 (citation omitted).

[58] CRS Study, *supra* n.10, at 23; *see Transparency Regime*, *supra* n.9, at 650.

[59] *Transparency Regime*, *supra* n.9, at 661-62, 677-79.

legal authorities" that appear to offer "*no* support for concluding an agreement."[60] Moreover, many cite Article II in addition to other authorities, with little distinction "between agreements that rely entirely on the President's sole constitutional authority and those that rely on authority granted by Congress or by virtue of a prior treaty."[61]

57.    All of this was hidden from public view. Neither the Case Act nor the Case Act regulations required publication of the cover memoranda, so they were not published on TIAS or otherwise made publicly available.[62]

**2023 Overhaul of the Transparency Requirements**

58.    In December 2022, Congress passed and the President signed the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 ("NDAA").[63]

59.    Through section 5947 of the NDAA, "Enhancing Transparency on International Agreements and Non-Binding Instruments," Congress amended the Case Act (1 U.S.C. § 112b) and, in so doing, implemented sweeping reforms to the publication and reporting requirements of its transparency regime for international agreements.[64]

60.    As the Senate Foreign Relations Committee explained in its 2023 report on section 5947, these reforms were necessary to ensure that "efforts to advance U.S. interests through" the use of agreements with "allies, partners, and other actors" are "conducted with accountability to Congress and, to the greatest extent appropriate, transparency for the public."[65] As it further explained, both congressional accountability and transparency in this arena "are essential to our

---

[60] *Id.* at 637.

[61] *Id.*

[62] *Id.* at 650. The authors of the empirical study referenced above obtained the cover memoranda via Freedom of Information Act litigation. *Id.* at 635.

[63] Pub. L. No. 117-263, 136 Stat. 2395 (2022).

[64] *See, e.g.*, Curtis A. Bradley, Jack Goldsmith & Oona Hathaway, *Congress Mandates Sweeping Transparency Reforms for International Agreements*, Lawfare (Dec. 23, 2022), https://perma.cc/K76U-HDZF.

[65] SFRC Rep., *supra* n.4, at 1.

democracy," and the Case Act "was an important but highly-limited and long-outdated framework" for achieving these ends.[66]

61.    Accordingly, Congress amended the Act through the NDAA, with the express aim of "strengthen[ing]" and "moderniz[ing]" both the publication and congressional reporting requirements.[67]

62.    With respect to publication, Congress greatly expanded the agreements covered.

a.    Whereas before Congress limited publication of binding agreements to the ones the State Department deemed sufficiently within "the public interest" to be published, *see supra* ¶ 41, Congress now requires the Department to publish nearly all non-classified binding agreements, with limited exceptions, *see* 1 U.S.C. § 112b(b)(1) (requiring the Secretary to "make . . . available to the public on the website of the Department of State" the "text" of international agreements, with the exception of, *inter alia*, classified agreements and various military or grant agreements).

b.    And whereas before the State Department did not publish any non-binding international agreements, *see supra* ¶ 44, Congress now requires the publication of "each qualifying non-binding instrument," 1 U.S.C. § 112b(b)(2). It defines a "qualifying non-binding instrument" as any agreement that:

> is or will be under negotiation, is signed or otherwise becomes operative, or is implemented *with one or more foreign governments, international organizations, or foreign entities*, including non-state actors; and
>
> *could reasonably be expected to have a significant impact on the foreign policy of the United States*, or is the subject of a written communication from the Chair or Ranking Member of either of [the Senate Committee on Foreign Relations or House Committee on Foreign Affairs] to the Secretary [of State], and
>
> does not include any non-binding instrument that is signed or otherwise becomes operative or is implemented pursuant to the authorities relied upon by the Department of Defense, the Armed Forces of the United States, or any element of the intelligence community.

*Id.* § 112b(k)(5) (emphases added).

---

[66] *Id.*

[67] *Id.*

63.     As the Senate Foreign Relations Committee explained, "[u]pdating the Case Act" to include such non-binding agreements was "critical to address their" increasing use since the Act's enactment and an "obvious gap" in their oversight.[68] As the Committee laid out: there previously "had been no uniform statutory approach to non-binding instruments"; "[c]onsequently, as such instruments have proliferated, there has been increasingly less visibility into the international commitments made on behalf of the United States."[69] And the "ad hoc" congressional oversight that had prevailed in the past—"case-specific statutory requirements with respect to particular non-binding instruments or, in the absence of any such law, requests from members of Congress for text and information on specific non-bindings"—was "not sustainable or acceptable, especially given the increasing reliance on non-bindings."[70] In other words, Congress expanded the Case Act to cover the "obvious gap in U.S. law" presented by non-binding international agreements.[71]

64.     Congress also expanded what must be published for covered agreements.

a.     Previously, Congress had not defined what agreement documents had to be published. It now requires the "text" of the agreement to be published, 1 U.S.C. §§ 112b(b)(1), (2), which it defines as not just the four corners of an agreement but also "any annex, appendix, codicil, side agreement, side letter, or any document of similar purpose or function . . . that is entered into contemporaneously and in conjunction with" an agreement, and "any implementing agreement or arrangement," *id.* § 112b(k)(7).

b.     Moreover, Congress now requires the contemporaneous publication of the authority or authorities underlying agreement text. It requires the State Department to publish "a

---

[68] *Id.* at 6; *see also* CRS Study, *supra* n.10, at 231.

[69] SFRC Rep., *supra* n.4, at 5.

[70] *Id.* at 6 (explaining that "case specific legislation is a difficult, uncertain, and time-consuming endeavor that devours scarce legislative resources, yet covers only the tiniest fraction of the executive branch's expansive non-binding practice," and that the Committee's experience "demonstrates" that Congress "cannot expect to [voluntarily] receive basic information" on these agreements "in a timely manner or on a consistent basis").

[71] *Id.*

*detailed description of the legal authority* that, in the view of the Secretary, provides authorization for" each binding agreement and that, "in the view of the appropriate department or agency, provides authorization for each qualifying non-binding instrument." *Id.* §§ 112b(a)(1)(A)(iii), (b)(1), (b)(2) (emphasis added). "If multiple authorities are relied upon," Congress has specified that "all such authorities" must be cited. *Id.* § 112b(a)(1)(A)(iii). And Congress has required specificity in the citations themselves, stating that "[a]ll citations to the Constitution of the United States, a treaty, or a statute shall include the *specific article or section and subsection reference* whenever available and, if not available, shall be as specific as possible," and that "the Secretary or appropriate department or agency shall explain the basis for [any] reliance" on "article II of the Constitution of the United States." *Id.* (emphasis added).[72]

65.     Congress also required publication of binding agreement text and accompanying legal authority information "[n]ot later than 120 days after" a covered agreement enters into force, rather than 180 days. *Id.* § 112b(b)(1). For non-binding agreements, Congress similarly provided that, "[n]ot less frequently than once every 120 days, the Secretary shall" publish "each" agreement "that became operative during the preceding 120 days," along with the accompanying legal information for each agreement. *Id.* § 112b(b)(2).

66.     With respect to congressional reporting, Congress likewise expanded the agreements and agreement information that is covered. The exact same agreements and agreement information that must be published also must be reported. *See id.* § 112b(b)(3) (noting certain defined categories of agreements that are exempt from publication but not reporting). But Congress requires this reporting to occur earlier than publication—and on a faster timeline than it previously required. Instead of requiring reporting within 60 days after an agreement has taken effect, it now requires reporting (to congressional leadership, the Senate Committee on Foreign Relations, and

---

[72] Congress also requires the publication of "a statement describing any new or amended statutory or regulatory authority anticipated to be required to fully implement each" agreement. *Id.* § 112b(a)(1)(B)(iii).

the House Committee on Foreign Affairs) "[n]ot less frequently than once each month" on all agreements "signed, concluded, or otherwise finalized during the prior month." *Id.* § 112b(a)(1).

67.    Finally, Congress enacted various additional Case Act amendments in the NDAA to facilitate greater transparency oversight of international agreements. For example, "[a]ny department or agency" that concludes a covered agreement must now provide the State Department with the text of the agreement, along with a detailed description of the legal authority for concluding it, within 15 days after the agreement is signed or otherwise finalized. *Id.* § 112b(d)(1). Moreover, each department or agency that enters into any covered agreement must designate a Chief International Agreements Officer to monitor compliance. *Id.* § 112b(e). And Congress appropriated to the State Department $1,000,000 per year through 2027 for purposes of implementing the Case Act, as amended by the NDAA. NDAA § 5947(a)(7).[73]

68.    As the Senate Foreign Relations Committee explained, the above-described provisions and section 5947 as a whole reflect a "critical bipartisan reform of the Case Act," and the end result of a "nearly two-year substantive engagement with the executive branch."[74] According to the Committee, "[n]o executive branch actor" communicated "a constitutional objection to section 5947" during the "interagency review process," and it was "not otherwise aware of any such objection or of the view that there are any conceivable grounds for one."[75] And, according to the Committee, the "extensive inter-branch process" and "direct sign-off" "by the White House, the Department of State, and the Department of Defense facilitated enactment of the Case Act reforms into law."[76]

---

[73] Pages 9-11 of the Senate Foreign Relations Committee's Report on Section 5947 of the NDAA, *supra* n.4, include a table that helpfully compares all key features of the Case Act before and after being amended.

[74] SFRC Rep., *supra* n.4, at 2 n.1, 4 (explaining that "[t]he Committee conducted dozens of hours of negotiations with multiple agencies and the White House, exchanged numerous draft texts, and incorporated significant amounts of interagency feedback and requested edits into the final product"). Secretary Rubio voted in favor of the amended Case Act's transparency reforms in committee on April 21, 2021, and again on the floor on December 15, 2022.

[75] *Id.* at 2 n.1.

[76] *Id.*

69.     The amended Case Act went into effect in September 2023. NDAA § 5947(c).

70.     In October 2023, pursuant to Congress's instruction in the NDAA (§ 5947(a)(5)), the State Department issued a final rule to update its Case Act regulations at 22 C.F.R. part 181. *See* 88 Fed. Reg. 67644; *see also* 88 Fed. Reg. 87671.

71.     Among other things, the updated regulations establish criteria that will apply to the identification of qualifying non-binding instruments. *See* 22 C.F.R. § 181.4; *see also* SFRC Rep., *supra* n.4, at 6-7 (explaining Committee's anticipation that the State Department would promulgate a regulation or share informal guidance on what non-bindings qualify). The regulations explain that, "[c]onsistent with" the amended Case Act, a qualifying non-binding instrument is one that "could reasonably be expected to have a significant impact on the foreign policy of the United States," and "[t]he degree of significance of any particular instrument requires an objective wholistic [sic] assessment." 22 C.F.R. § 181.4(a)(2), (b)(3)(i). "Factors that may be relevant . . . include whether, and to what extent, the" non-binding instrument:

> (A) Is of importance to the United States' relationship with another country, such as by addressing a significant new policy or initiative (rather than ongoing activities or cooperation); (B) Affects the rights or responsibilities of U.S. citizens, U.S. nationals, or individuals in the United States; (C) Impacts State laws; (D) Has budgetary or appropriations impact; (E) Requires changes to U.S. law to satisfy commitments made therein; (F) Presents a new commitment or risk for the entire Nation; and (G) Is of Congressional or public interest.

*Id.* § 181.4(b)(3)(i); *see also* SFRC Rep., *supra* n.4, at 6-7 (similar).

72.     The regulations also set forth the State Department's procedures for how it and other U.S. agencies across the government should identify the agreements that qualify under the amended Case Act and coordinate to ensure the Department is, consistent with its amended Case Act regulations, transmitting all qualifying agreements to Congress, publishing them online, and doing so in a timely fashion. *See* 22 C.F.R. §§ 181.3, 181.5-181.9.

## FACTUAL ALLEGATIONS

### October 2023–December 2024: Defendants Make Regular Case Act Postings

73.     Beginning in October 2023, the State Department began posting, on a monthly

basis, the text of binding international agreements to its TIAS website (https://www.state.gov/tias/).[77] That same month, the agency also began posting the detailed descriptions of the legal authorities on which the international agreements relied; it posted the descriptions to a separate website titled "Information Relating to International Agreements" (https://foia.state.gov/FOIALIBRARY/IRIA2.aspx).

74.    Between October 2023 and December 2024, the State Department posted to these websites 109 binding agreements and detailed descriptions for their legal authorities. Notable examples include an agreement with Côte d'Ivoire to counter illicit transnational maritime activity like drug trafficking, organized crime, and migrant smuggling[78]; multilateral agreements between the United States and 13 Indo-Pacific countries to formally establish the Indo-Pacific Economic Framework for Prosperity, in order to facilitate economic cooperation and engagement in the region[79]; three additional multilateral agreements for the economic framework, on strengthening supply chain resilience,[80] advancing fair economy principles through measures like anti-bribery and anti-corruption legislation and regulations,[81] and supporting clean economy measures like climate-friendly technologies[82]; and a bilateral security agreement with Ukraine in support of the country's ongoing efforts to defend itself against Russia's invasion, and in the event of any future armed attack or threat of armed attack.[83]

---

[77] Previously, the agency had posted some, but not all, binding international agreements to this website.

[78] Available at https://www.state.gov/wp-content/uploads/2024/04/24-206-Cote-DIvoire-Maritime-Matters.pdf.

[79] Available at https://www.state.gov/wp-content/uploads/2025/02/24-1011-IPEF-Overarching-Agreement-signed-6-June-2024.pdf.

[80] Available at https://www.state.gov/wp-content/uploads/2025/02/24-224-IPEF-Supply-Chains-Agreement.pdf.

[81] Available at https://www.state.gov/wp-content/uploads/2025/02/24-1012-IPEF-Fair-Economy-Agreement-signed-6-June-2024.pdf.

[82] Available at https://www.state.gov/wp-content/uploads/2025/02/24-1011.1-IPEF-Clean-Economy-Agreement-signed-6-June-2024.pdf.

[83] Available at https://www.state.gov/wp-content/uploads/2024/07/24-613-Ukraine-Defense-revised.pdf.

75.    Other examples include defense agreements with Haiti and Japan to furnish them with certain military goods and technologies[84]; an agreement with Bulgaria regarding the exchange of tax information[85] and with Cyprus regarding the exchange of traveler information to mitigate against crime and strengthen border security[86]; agreements to facilitate international air transport with the Dominican Republic[87] and Fiji[88]; and an agreement with India to restrict imports into the United States of certain Indian archaeological material.[89]

76.    One early assessment of the State Department's posting activity commended the agency for its "major improvement in international agreement accountability," including because the agency was posting more binding executive agreements and was, "[a]s directed by the new law," providing "more specific" legal citations than what it had previously provided in its past, nonpublic cover memoranda.[90]

77.    Beginning in October 2023, the State Department also began posting, on a monthly basis, the text of qualifying non-binding international agreements; it did so on a separate website from the TIAS website, titled "Qualifying Non-binding Instruments" (https://foia.state.gov/FOIA LIBRARY/QNI2.aspx). One early assessment commended the agency for posting nearly as many non-binding agreements as binding ones.[91]

---

[84] Available at https://www.state.gov/wp-content/uploads/2024/08/24-424-Haiti-Defense-FH-revision.pdf, and https://www.state.gov/wp-content/uploads/2025/09/24-724-Japan-Defense-Missiles.pdf.

[85] Available at https://www.state.gov/wp-content/uploads/2024/10/24-722-Bulgaria-Taxation.pdf.

[86] Available at https://www.state.gov/wp-content/uploads/2025/02/24-1125.1-Cyprus-Law-Enforcement.pdf.

[87] Available at https://www.state.gov/wp-content/uploads/2025/04/24-1219-Dominican-Republic-Transportation.pdf.

[88] Available at https://www.state.gov/wp-content/uploads/2024/11/24-828-Fiji-Air-Transport-Agreement.pdf.

[89] Available at https://www.state.gov/wp-content/uploads/2024/10/24-726-India-Cultural-Exchanges.pdf.

[90] Curtis Bradley, Jack Goldsmith & Oona Hathaway, *Transparency of International Agreements Under the Revised Case-Zablocki Act*, Lawfare (June 10, 2024), https://perma.cc/2M3N-E7N2.

[91] *Id.*

78.    Between October 2023 and December 2024, the State Department posted 70 qualifying non-binding agreements. For example, the agency posted agreements with several countries regarding cooperation to counter foreign state information manipulation (including with Japan and Korea)[92]; an agreement with Romania to enhance cooperation in preventing and combatting serious crime and with Somalia for military base construction in the country[93]; a multilateral commitment of principles for combating illegal wildlife trade[94]; an agreement with the Dominican Republic on the vaccination of pigs against African swine fever and with New Zealand to share information, coordinate regulation, and support each other's oversight of commercial space transportation activities conducted from New Zealand by FAA-licensed operators[95]; an agreement with Panama for assistance and cooperation on immigration matters[96]; and an agreement with Argentina to establish a high-level strategic dialogue.[97]

79.    During this period, the agency also posted each month the detailed descriptions for each qualifying non-binding agreement; it posted the descriptions on a separate website titled "Information Relating to Qualifying Non-binding Instruments" (https://foia.state.gov/FOIA LIBRARY/IRQNI2.aspx). Unlike for the binding agreements, the agency did not post individualized descriptions for each agreement. Instead, it provided the following blanket assertion of authority for each monthly posting:

Unless otherwise indicated, the following statement of legal authority in accordance with 1 USC 112b(a)(1)(A)(iii) applies to all listed instruments: The authority to enter

---

[92] Available at https://foia.state.gov/_docs/CaseAct/Zip%20file%20of%20Non-Bindings%20 reported%201.31.2024.zip.

[93] Available at https://foia.state.gov/_docs/CaseAct/Zip%20file%20of%20Non-Bindings%20 reported%203.29.2024.zip.

[94] Available at https://foia.state.gov/_docs/CaseAct/Zip%20file%20of%20Non-Bindings%20 reported%204.30.2024.zip.

[95] Available at https://foia.state.gov/_docs/CaseAct/Zip%20file%20of%20Non-Bindings%20 reported%205.31.2024.zip.

[96]Available at https://foia.state.gov/_docs/CaseAct/Zip%20file%20of%20Non-Bindings%20 reported%208.30.2024.zip.

[97] Available at https://foia.state.gov/_docs/CaseAct/Zip%20file%20of%20Non-Bindings%20 reported%2010.31.2024.zip.

into non-binding instruments with foreign states and other foreign actors in connection with the conduct of foreign relations derives from the President's powers under Article II of the Constitution. The President has authority under Article II to represent the nation in foreign affairs, including the authority to communicate with foreign governments and to determine the form and manner in which the Executive engages in diplomacy. As applied to the entry into non-binding instruments with foreign states and other foreign actors in connection with the conduct of foreign relations, these authorities are exercised on a day-to-day basis by the agencies and departments of the executive branch under the general supervision of the President as Chief Executive, and in consultation with the Secretary of State.[98]

**January 2025–Present: Defendants Disregard Their Amended Case Act Obligations**

80.    On February 11, 2025, President Donald J. Trump issued an executive order entitled *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative,* requiring agency heads to "promptly" prepare to "initiate large scale reductions in force (RIFs)." Exec. Order No. 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025).

81.    In April 2025, Secretary Rubio publicly announced a major State Department restructuring plan, in which the agency would eliminate or consolidate certain bureaus and offices.[99]

82.    In July 2025, the State Department initiated its planned firings; it sent RIF notices to roughly 15% of its workforce—nearly 1,350 employees, more than 1,000 of whom were domestic civil service employees.[100] By this point, an estimated 1,600 employees had already left the Department voluntarily through early retirement or resignation buyouts.[101]

---

[98] *See, e.g.*, U.S. Dep't of State, *Information described in 1 USC 112b(a)(1)(A)(iii) and (B)(iii) relating to qualifying non-binding instruments reported to Congress on October 31, 2023, as having become operative*, at 1 (Oct. 2023), https://perma.cc/82FN-C2W8.

[99] *See, e.g.*, Sec'y of State Marco Rubio, *Building an America First State Department* (Apr. 22, 2025), https://perma.cc/9FRJ-A6XB.

[100] *See, e.g.*, Eric Katz, *State Department Lays Off 1,350 Employees*, Gov't Exec. (July 11, 2025), https://perma.cc/S2DK-VFGG; Matthew Lee, Farnoush Amiri & Manuel Balce Ceneta, *State Department Lays Off Over 1,300 Employees Under Trump Administration Plan*, Associated Press (July 11, 2025), https://perma.cc/CX54-WUL5; Andrew Roth, *US State Department Issues First of 1,350 Termination Orders After Court Lifted Ban*, The Guardian (July 11, 2025), https://perma.cc/92XE-9TJW.

[101] *See, e.g.*, Roth, *supra* n.100; Letter from Sen. Cory Booker *et al.*, to Sec'y of State Marco Rubio (July 11, 2025), https://perma.cc/4NFF-A8ZV.

83.     The July 2025 RIF generated significant public criticism, including from members of Congress, because of concerns that the mass firing would diminish the Department's capabilities, sow chaos and confusion in its operations, and impair its ability to carry out its various foreign affairs and foreign policy functions.[102] Those concerns persist today.[103]

84.     The July 2025 RIF affected bureaus and offices across the Department,[104] including some with responsibilities related to international agreements.[105]

85.     The RIF coincided with the State Department's abandonment of its responsibility to maintain the international agreements websites under the amended Case Act.

86.     The Department did not update the international agreements websites at all in the first several months of 2025. An April 1, 2025 archived version of the TIAS website for binding agreements text contains zero posts from 2025, and a March 4, 2025 archived version of the website for non-binding agreements text similarly lacks any 2025 posts.[106]

87.     By July 2025, the Department had posted some agreements to the websites, and the corresponding websites containing legal authority information. It had posted text for 20 binding

[102] *See, e.g.*, Michael Sainato, *'It's A Madhouse': US State Department Workers Reeling After Trump's Firings*, The Guardian (July 21, 2025), https://perma.cc/9Y8G-L3GA; Jennifer Hansler, Kylie Atwood & Annie Grayer, *State Department Firings Will Hit Trump Admin's Ability to Tackle Its Own Priorities, Sources Say*, CNN (July 17, 2025), https://perma.cc/2U85-LUEK; Margaret Brennan *et al.*, *Sources Describe Disarray at State Department After Trump Administration's Layoffs*, CBS News (July 16, 2025), https://perma.cc/3P4N-ZC7K; AFGE, *State Department RIFs Spark Chaos, Confusion, and Outrage* (July 21, 2025), https://www.afge.org/article/state-department-rifs-spark-chaos-confusion-and-outrage/.

[103] *See, e.g.*, Jennifer Hansler, *Trump Administration Changes Have Left US Diplomats Demoralized and Less Able to Do Their Jobs, Report Says*, CNN (Dec. 3, 2025), https://www.cnn.com/2025/12/03/politics/state-department-low-morale.

[104] *See, e.g.*, Brennan *et al.*, *supra* n.102.

[105] *See* Jory Heckman, *These Are the State Department Offices Hit Hardest By Widespread Layoffs*, Fed. News Network (July 25, 2025), https://perma.cc/2UPF-CREF.

[106] The two archived websites are available from The Internet Archive at https://web.archive.org/web/20250401085817/https://www.state.gov/tias/, and https://web.archive.org/web/20250304211007/https://foia.state.gov/FOIALIBRARY/QNI2.aspx, respectively. The Internet Archive is a nonprofit that archives Internet webpages. *See* Internet Archive, *About the Internet Archive*, https://archive.org/about/.

agreements, only 7 of which were signed during this administration, and information for 39 binding agreements, only a few of which were signed during this administration[107]; and it had posted text and information for 24 non-binding agreements, only 8 of which were signed during this administration.[108] But the State Department abruptly stopped posting agreements when the July 2025 RIF occurred, and it has only partially and sporadically resumed posting in recent months.

88.    As of this filing, the State Department has not posted any agreements to the binding agreements text website that have entered into force since June 2025.[109] And, as of the date of this filing, it has not resumed regular and timely posting on the binding agreements information website; rather, it has only sporadically posted to the website, going several months without any update before belatedly adding information in December 2025 and January 2026 for some agreements, most of which entered into force between 6-12 months ago.[110]

---

[107] The text of the 20 binding agreements is accessible on the current TIAS website. *See* U.S. Dep't of State, *Treaties and Other International Acts Series (TIAS)*, https://www.state.gov/tias/ (last visited Mar. 5, 2026, https://perma.cc/XNM4-GFTD). A July 15, 2025 archival version of the legal authority website for binding agreements, available at https://web.archive.org/web/2025071 5195640/https://foia.state.gov/FOIALIBRARY/IRIA2.aspx, shows posts for January-April 2025. The posts for these months are accessible on the current version of the legal authority website. *See* U.S. Dep't of State, *Information Relating to International Agreements*, https://foia.state.gov/FOIA LIBRARY/IRIA2.aspx (last visited Mar. 5, 2026, https://perma.cc/P9GY-GZDW).

[108] A July 15, 2025 archival version of the legal authority website for non-binding agreements, available at https://web.archive.org/web/20250715195640/https://foia.state.gov/FOIALIBRARY /IRQNI2.aspx, shows posts for January-May 2025. The agreement text and corresponding legal authority information posted for these months are accessible on the current non-binding agreement text website, *see* U.S. Dep't of State, *Qualifying Non-binding Instruments*, https://foia.state.gov/ FOIALIBRARY/QNI2.aspx (last visited Mar. 5, 2026, https://perma.cc/P2U8-EAWK), and legal authority website, *see* U.S. Dep't of State, *Information Relating to Qualifying Non-binding Instruments*, https://foia.state.gov/FOIALIBRARY/IRQNI2.aspx (last visited Mar. 5, 2026, https: //perma.cc/GWH4-H2SS).

[109] *See TIAS*, *supra* n.107.

[110] *See Information Relating to International Agreements*, *supra* n.107.

89.     As of this filing, the State Department also has not resumed regular and timely posting of agreements or legal authority information to the non-binding agreements websites.[111] Rather, it has only sporadically posted to the websites, going several months without any updates before belatedly adding text and information in late 2025 and early 2026 for a small set of agreements, virtually all of which entered into force between 6-12 months ago.

90.     The State Department's refusal to comply with its amended Case Act obligations and properly maintain its Case Act websites has meant that the American people lack critical information regarding international agreements that the Trump administration has negotiated.

91.     Public reporting and the administration's own statements indicate there are numerous Case Act-covered agreements (and associated information) that should be posted to the Case Act websites, but that the State Department is unlawfully refusing to post. That includes significant international agreements like the:

        a.     February 2025 agreements with both Costa Rica and Panama for the countries to accept third-country nationals deported from the U.S.[112];

---

[111] *See Qualifying Non-binding Instruments*, *supra* n.108; *Information Relating to Qualifying Non-binding Instruments*, *supra* n.108.

[112] *See, e.g.*, Camilo Montoya-Galvez, *U.S. Deporting African and Asian Migrants to Panama in Diplomatic Breakthrough*, CBS News (Feb. 13, 2025), https://perma.cc/Q9ZV-SKW5; Jeff Ernst, *Trump Is Making Central American Become a Dumping Ground for US Immigrants*, The Guardian (Mar. 2, 2025), https://perma.cc/BBC3-BDM9; Human Rights Watch, *"The Strategy Is to Break Us": The US Expulsion of Third-Country Nationals to Costa Rica* (May 22, 2025), https://perma.cc/E4AF-VAB2; *see also, e.g.*, U.S. Dep't of War, *Readout of Secretary of Defense Pete Hegseth's Call With Panama's Minister of Public Security* (Feb. 5, 2025), https://perma.cc/KY2H-YT7W. In August 2025, Senator Jeanne Shaheen wrote a letter to Secretary Rubio requesting the agreements with Costa Rica and Panama under the Case Act, explaining that the administration had not provided public details regarding the agreements or what would happen to deported individuals. *See* Letter from Sen. Jeanne Shaheen, Ranking Member of S. Comm. on Foreign Relations, to Sec'y of State Marco Rubio (Aug. 4, 2025), https://perma.cc/NN35-QGER. Nonetheless, the State Department has not posted Costa Rica or Panama detention agreement information to its Case Act websites.

b.    February/March 2025 agreements with El Salvador for the country to detain

Venezuelan TdA gang members deported from the United States and to receive Salvadoran MS-

13 gang members in U.S. custody[113];

[113] *See, e.g.*, Curtis Bradley, Jack Goldsmith & Oona Hathaway, *The New Transparency Rules and the El Salvador Detention Agreement*, Lawfare (Apr. 17, 2025), https://perma.cc/9DXU-QT25 (discussing agreement for El Salvador to detain TdA members at its infamous Terrorism Confinement Center prison, also known as CECOT, for millions of dollars); Dan Goodling, *Trump Admin's $4.7 Million Deal With El Salvador Revealed in Court Filing*, Newsweek (Sept. 9, 2025), https://www.newsweek.com/trump-administration-el-salvador-deal-cecot-alien-enemies-act-lawsuit-2127087 (same); John Hudson, Jeremy Roebuck & Samantha Schmidt, *Rubio Promised to Betray U.S. Informants to Get Trump's El Salvador Prison Deal*, Wash. Post (Oct. 19, 2025), https://www.washingtonpost.com/national-security/2025/10/19/rubio-el-salvador-prison-bukele-ms13-informants/ (discussing deal for return of MS-13 gang members to El Salvador); *see also, e.g.*, U.S. Dep't of State, *Secretary of State Marco Rubio and Salvadoran Foreign Minister Alexandra Hill Tinoco at the Signing of a Memorandum of Understanding Concerning Strategic Civil Nuclear Cooperation* (Feb. 3, 2025), https://perma.cc/26VW-Q4RB (discussing, in part, agreement for El Salvador to detain U.S. deportees); Letter from Sen. Jeanne Shaheen, Ranking Member of S. Comm. on Foreign Relations, to Sec'y of State Marco Rubio (Apr. 14, 2025), https://perma.cc/AR5X-DZNP (noting Secretary Rubio's public discussion of such agreements and the fact that they fell within the purview of the Case Act).

In September 2025, plaintiffs in ongoing civil litigation in this District (challenging the Trump administration's decision to detain individuals in El Salvador) publicly filed a copy of a March 2025 agreement for El Salvador to detain 238 deported TdA members. *See* Ex. 1, *Robert F. Kennedy Human Rights v. Dep't of State*, No. 25-cv-1774-JEB (Sept. 8, 2025), ECF No. 30-1; *see also* Goodling, *supra*. But the State Department has not posted either this agreement or legal authority information concerning it to its Case Act websites. All it has posted to the websites are March 2025 diplomatic notes with scant details. *See* Brian Finucane, *The Legal Fig Leaf: The US-El Salvador Detainee Diplomatic Notes* (July 17, 2025), https://perma.cc/4MER-HESB (explaining that the diplomatic notes provide "few additional details" on the prisoner transfer agreement between the United States and El Salvador that, "[r]ather than memorializing the full terms of the deal, the principal function of these documents appears to be establishing a written record that the United States sought and received . . . assurances" that detainees would not be tortured). As a result, members of Congress have continued to request disclosure of El Salvador detention agreements, in conformity with the Case Act. *See* Letter from Reps. Gregory W. Meeks, Ranking Member of House Foreign Affairs Comm., Jamie Raskin, Ranking Member of House Jud. Comm., & Joaquin Castro, Ranking Member of Subcommittee on the Western Hemisphere, to Sec'y of State Marco Rubio (Dec. 23, 2025), https://perma.cc/DXM6-G55J (citing prior requests in footnotes 1 and 2).

c.    May 2025 agreements with both Qatar and Saudi Arabia for defense sales and investments worth tens of billions of dollars[114];

d.    May 2025 implementing agreement, creating a limited partnership, for the Ukraine-U.S. framework agreement establishing terms for joint investment and economic partnership in Ukraine's critical minerals and other natural resources and the country's post-war economic recovery[115]; and,

e.    Trade deals throughout 2025 with, among others, the European Union and the Philippines.[116]

---

[114] *See, e.g.*, *US and Saudi Arabia Agree to $142bn Weapons Sale During Trump Visit*, Al Jazeera (May 13, 2025), https://perma.cc/H7WM-8PTU; Luke Broadwater, Vivian Nereim & Jonathan Swan, *Trump Cites $600 Billion in Saudi Deals, But Real Figure Appears Lower*, N.Y. Times (May 13, 2025), https://www.nytimes.com/2025/05/13/world/middleeast/trump-saudi-economic-forum.html; Sara Dorn, *U.S. Will Build Massive AI Data Center In Abu Dhabi: See The List Of Deals Trump Announced In The Middle East*, Forbes (May 15, 2025), https://www.forbes.com/sites/saradorn/2025/05/15/us-will-build-massive-ai-data-center-in-abu-dhabi-see-the-list-of-deals-trump-announced-in-the-middle-east/; *see also* The White House, *Fact Sheet: President Donald J. Trump Secures Historic $600 Billion Investment Commitment in Saudi Arabia* (May 13, 2025), https://perma.cc/LH5Y-GE7K; The White House, *Fact Sheet: President Donald J. Trump Secures Historic $1.2 Trillion Economic Commitment in Qatar* (May 14, 2025), https://perma.cc/CLR3-ZZC4. As reflected in the public reporting and the administration's own statements on the Qatar and Saudi Arabia deals, the deals involve government-to-government arms and other defense and investment agreements, in addition to commercial agreements involving private companies that likely fall outside of the Case Act's ambit.

[115] *See, e.g.*, Mykhailo Soldatekno, *The Ukraine-U.S. Minerals Deal: Impossible Choice for a Nation at War*, Lawfare (June 3, 2025), https://perma.cc/TU89-4C4R; Curtis Bradley, Jack Goldsmith & Oona Hathaway, *The U.S.-Ukraine Agreement: Legality and Transparency*, Lawfare (May 6, 2026), https://perma.cc/F8B2-D54V; *see also, e.g.*, The White House, *Fact Sheet: President Donald J. Trump Secures Agreement to Establish United States-Ukraine Reconstruction Investment Fund* (May 1, 2025), https://perma.cc/268S-PBYM. As of this filing, only the framework agreement is available on TIAS.

[116] *See, e.g.*, Lisa O'Carroll, *Trump and von der Leyen Announce US-EU Trade Deal*, The Guardian (July 27, 2025), https://perma.cc/NG9F-G33W; The White House, *Fact Sheet: The United States and European Union Reach Massive Trade Deal* (July 28, 2025), https://perma.cc/J72J-ZP96; Elisabeth Buchwald, *Trump Announces Trade Agreement with the Philippines and Terms of Deal with Indonesia*, CNN (July 23, 2025), https://www.cnn.com/2025/07/22/business/trump-philippines-trade-deal; *see also, e.g.*, The White House, *Fact Sheet: President Donald J. Trump Secures Unprecedented U.S.–Japan Strategic Trade and Investment Agreement* (July 23, 2025), https://perma.cc/3T45-DDEW (discussing Japan trade deal); Daniel Desrochers, Ben Lefebvre & Ari Hawkins, *Trump Wants Japan to Fund His Government's*

92.    These agreements—which are but a few slices of the immigration, defense, trade, and other foreign deals that President Trump and his administration have struck over the past year with great fanfare—have generated significant public interest and are of continuing public concern. But neither their text nor their legal authority information can be found on the State Department's Case Act websites, depriving the American people the opportunity to judge for themselves, based on the full and unvarnished agreement details, whether the agreements "mak[e] America safer, stronger, and more prosperous" and serve the national interest.[117]

93.    And beyond these marquee agreements, the State Department has also refused to post to its Case Act websites the text or legal information for various agreements that undergird day-to-day cooperation with our allies. Although it has trumpeted these agreements in press materials over the course of the past year—touting, for instance, a water delivery agreement with Mexico, a public health agreement with the Philippines, a commercial space technology safeguards agreement with Sweden, and civil nuclear cooperation agreements with Bahrain, Malaysia, and Thailand[118]—and although it published such agreements prior to 2025,[119] it has declined to fully do so now.

94.    In short, the State Department has failed in the past year to adequately fulfill its Case Act obligations. At best, its Case Act website postings have been incomplete and quite

---

*Ambitious Spending. What's in It for Them?*, Politico (Oct. 3, 2025), https://www.politico.com/news/2025/10/03/japan-trump-trade-lutnick-00593711 (same); *Time Interview*, *supra* n.2.

[117] *See, e.g.*, U.S. Dep't of State, *2025 Diplomatic Wins*, https://perma.cc/NRD2-9WEA.

[118] *See, e.g.*, U.S. Dep't of State, *Mexico's Water Deliveries and Steps to Meet 1944 Water Treaty Requirements* (Apr. 29, 2025), https://perma.cc/AU3L-BSUL; U.S. Dep't of State, *U.S. Announces New Health Sector Assistance for the Philippines* (Sept. 11, 2025), https://perma.cc/UM9D-YFQ5; *U.S.-Sweden Technology Safeguards Agreement*, U.S. Dep't of State (June 20, 2025), https://perma.cc/B2TL-TSR2; U.S. Dep't of State, *United States and Bahrain Sign Memorandum of Understanding Concerning Strategic Civil Nuclear Cooperation* (July 16, 2025), https://perma.cc/D2NU-XUPW; U.S. Dep't of State, *United States and Malaysia Sign Memorandum of Understanding Concerning Strategic Civil Nuclear Cooperation and Launch Negotiations for a Civil Nuclear Cooperation Agreement* (July 10, 2025), https://perma.cc/45KT-KDN3; U.S. Dep't of State, *United States and Thailand Civil Nuclear Cooperation Agreement Enters into Force* (July 11, 2025), https://perma.cc/FC8V-LR9F.

[119] *See supra* ¶¶ 73-78.

delayed. As a result, the websites have lacked, and continue to lack, timely and complete international agreements information.[120]

95.    And this is not merely a retrospective issue, but a going-forward one as well. The Trump administration's international dealmaking shows no signs of slowing down, so the State Department's Case Act failings threaten to further hinder objective and meaningful public understanding of recent and impending agreements—including, but not limited to, those concerning Venezuela oil sales following the U.S.'s military operation to arrest and extradite the country's president[121]; deepening energy and defense ties with various allies[122]; and new trade and other initiatives with several countries.[123] Absent resumed Case Act compliance, the American

---

[120] Through section 5947 of the NDAA, Congress tasked the Comptroller General, the director of the Government Accountability Office ("GAO"), with helping to monitor compliance with the amended Case Act requirements. The Comptroller General must conduct an audit every three years for the nine years following the amendment and submit the results of each audit in writing to congressional leadership and the Senate Foreign Relations and House Foreign Affairs Committees; and GAO and the State Department must publish the audit results on their respective websites. 1 U.S.C. § 112b(h). It is Plaintiff's understanding that this audit is underway and set to be completed this year. The published audit results may reveal additional Case Act non-compliance by Defendants, both during this administration and the previous one. *Cf. Transparency Regime*, *supra* n.9, at 695-96 (citing prior GAO report that revealed compliance issues before the 2022 amendment of the Case Act).

[121] *See, e.g.*, U.S. Dep't of Energy, *Fact Sheet: President Trump Is Restoring Prosperity, Safety and Security for the United States and Venezuela* (Jan. 7, 2026), https://perma.cc/R7BL-Y3E4; Emily Meierding, *Explaining Trump's Oil Grab*, Lawfare (Jan. 13, 2026), https://perma.cc/T8Q7-5ETB; Scott R. Anderson & Alex Zerden, *Unpacking the Trump Administration's Plans for Venezuela's Oil Revenue*, Lawfare (Feb. 2, 2026), https://perma.cc/ML2Z-5NZD.

[122] *See, e.g.*, The White House, *Fact Sheet: President Donald J. Trump Solidifies Economic and Defense Partnership with the Kingdom of Saudi Arabia* (Nov. 18, 2025), https://perma.cc/JE6K-BKSL; U.S. Dep't of State, *A New Era in U.S. Kazakhstan Relations* (Nov. 7, 2025), https://perma.cc/MK65-ZV4K; The White House, *Fact Sheet: President Donald J. Trump Closes Billion-Dollar Deals with Australia* (Oct. 20, 2025), https://perma.cc/ZJ2S-89VT.

[123] *See, e.g.*, The White House, *Fact Sheet: President Donald J. Trump Strikes Deal on Economic and Trade Relations with China* (Nov. 1, 2025), https://perma.cc/J2F5-WG6G; The White House, *Joint Statement on Framework for United States-El Salvador Agreement on Reciprocal Trade* (Nov. 13, 2025), https://perma.cc/QMS9-9JDD; The White House, *Fact Sheet: The United States, Switzerland, and Liechtenstein Reach a Historic Trade Deal* (Nov. 14, 2025), https://perma.cc/Y96H-CU9A; U.S. Dep't of State, *America First Global Health Strategy – Bilateral Agreements on Global Health Cooperation* (Dec. 4, 2025), https://perma.cc/V558-KJX9; U.S. Dep't of State,

people will have only the administration's press products, and any available public reporting, to learn about and evaluate these and other agreements made purportedly on their behalf.

**Harms to Plaintiff**

96.    Plaintiff has been deprived of binding and non-binding international agreement terms and underlying authority information that it is entitled to under the amended Case Act.

97.    As discussed, the amended Case Act mandates that the State Department "shall" publicly post on the agency's "website," "[n]ot later than 120 days" of an agreement's in-force date, the agreement's "text" and "[a] detailed description of the [agreement's] legal authority," with "cite[s]"[124] to "all" authorities that include "the specific [constitutional, treaty, or statutory] article or section and subsection reference whenever available." 1 U.S.C. §§ 112b(a)(1)(A)(iii), (b)(1), (b)(2).

98.    Likewise, the PRA requires the State Department to "ensure that the public has timely and equitable access to the agency's public information," 44 U.S.C. § 3506(d)(1), which includes the agreement text and authority information it must post to its Case Act websites.

99.    By depriving Plaintiff of this statutorily mandated and fundamental information for a range of agreements in the past year—from Latin American detention deals to Middle East defense deals to trade and other deals across the world—Defendants have caused Plaintiff precisely the type of harm Congress sought to prevent through the public disclosure requirements of the amended Case Act: a lack of transparency into the international commitments that the executive branch is entering into on behalf of the American people and in their name. Because these international agreements generally are not subject to judicial review or legislative veto,[125] the Case Act's (and PRA's) transparency guarantees—which Defendants are flouting—represent the *only*

---

*Delivering on President Trump's Commitment: America First Global Health Strategy and Bilateral Health MOUs* (Dec. 22, 2025), https://perma.cc/2T9H-AKQH.

[124] *See* SFRC Rep., *supra* n.4 at 1, 8 (explaining that the amended Case Act reforms afford the public "greater understanding of the use of international accords as a foreign policy tool," which is "essential to our democracy" and "will lead to a stronger and more sustainable foreign policy").

[125] *Transparency Regime*, *supra* n.9, at 633-34, 701, 705.

meaningful means by which Plaintiff and the broader public can "ensure [the executive branch] is carrying out its responsibilities to make" foreign deals "in a lawful, prudent manner and without various forms of corruption, such as self-serving discrimination or self-dealing."[126]

100.    Based on its longstanding professional work, Plaintiff has a particularly strong interest in international agreement transparency and public accountability and thus has experienced, and will continue to experience, specific and particularized harms from Defendants' conduct.

101.    Lawfare, a nonprofit organization that publishes an eponymous online multimedia publication with written, audio, and other content from a range of journalists, lawyers, scholars, and other regular contributors—is dedicated to studying the executive branch's foreign affairs and foreign policy powers and activities, among other related national security subjects, and conveying their understanding to policymakers, practitioners, and, most importantly, the American public in a timely manner. Indeed, a primary organizational purpose of Plaintiff is to educate and inform the American people, and improve public discourse, on legal and policy issues relating to the country's engagement with countries around the world, including for the purpose of enhancing American participatory democracy with respect to those issues.

102.    As part of their work, *Lawfare*'s staff and contributors have carefully parsed presidential and other executive branch statements and materials to analyze and discuss the binding and non-binding commitments the United States is making with other countries and the legal authorities on which those commitments rest. They have relied in particular on the agreement text and authority documents posted on the State Department's Case Act websites, which, prior to Defendants' conduct and consistent with Congress's intent, provided a centralized, publicly available, and regularly updated online repository of agreement-related information.

103.    By depriving Plaintiff of timely and complete information in this repository and refusing to post required information for a range of agreements in the past year, Defendants have

---

[126] *Id.* at 701; *see id.* at 702

inhibited Plaintiff's ability to fully understand the key details of these agreements and educate the public on them. As public discourse on several of these agreements, and the U.S.'s broader relationships with their participant nations, has swelled, Plaintiff's lack of Case Act materials has inhibited its ability to contribute to and enhance that discourse.[127] And it has required them to expend time and resources to discern alternative and less adequate sources of information regarding Case Act-covered agreements.

## CLAIMS FOR RELIEF
### COUNT I
### APA Contrary to Law (the Case Act)

104.    Plaintiff hereby incorporates by reference the foregoing paragraphs of the Complaint as if set forth herein.

105.    Under the APA, a court shall "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

106.    Defendants' decision to abandon the timely and proper maintenance and operation of the Case Act international agreements websites violates the requirements of the amended Case Act and the State Department's implementing regulations, which impose on the agency a continuing obligation to post online to the agency's website the text and detailed information on supporting legal authorities for all covered binding and non-binding international agreements.

107.    Accordingly, Defendants have taken agency action that is contrary to law.

---

[127] To give one example: *Lawfare* has featured a range of articles and other content in the past several years on the U.S.'s relationship with Ukraine in the face of Russian aggression and warfare. Its coverage in the past year has analyzed the Ukraine-U.S. minerals deal and educated the public on it using publicly available information, but as one Lawfare contributor has noted, that public information "provides only" a "partial" understanding, as "the specific details" of the deal are "fleshed out" in an undisclosed implementing agreement. Soldatekno, *supra* n.115. Absent these details, Plaintiff cannot fully inform the American people about the nature of the deal, risking "surprises and disappointments down the road that may harm U.S.-Ukraine relations and result in legal disputes." *Id.*

## COUNT II
### APA Unlawful Withholding or Unreasonable Delay of Case Act Obligations

108.    Plaintiff hereby incorporates by reference the foregoing paragraphs of the Complaint as if set forth herein.

109.    Under the APA, a court "shall compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

110.    The amended Case Act states that the Secretary "shall make . . . available to the public on the website of the Department of State" the "text" of each binding "international agreement" and accompanying legal authority information "[n]ot later than 120 days after the date on which" the agreement "enters into force." 1 U.S.C. § 112b(b)(1). For non-binding international agreements, the Act also provides that "[n]ot less frequently than once every 120 days, the Secretary shall" publish the text of "each" agreement "that became operative during the preceding 120 days," along with the accompanying legal information for each agreement. *Id.* § 112b(b)(2).

111.    In no longer fulfilling these statutory obligations in a timely and fulsome manner, and abandoning the posting of international agreement text or accompanying legal information for a range of covered binding and non-binding international agreements, Defendants have "unlawfully withheld or unreasonably delayed" taking actions required by law. 5 U.S.C. § 706(1).

## COUNT III
### APA Contrary to Law (the Paperwork Reduction Act)

112.    Plaintiff hereby incorporates by reference the foregoing paragraphs of the Complaint as if set forth herein.

113.    Under the APA, a court shall "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

114.    The Paperwork Reduction Act requires agencies to "ensure that the public has timely and equitable access to the agency's public information." 44 U.S.C. § 3506(d)(1).

115.    By disregarding their responsibilities to maintain the international agreements websites in a timely and complete manner, Defendants have failed to ensure timely and equitable access to the State Department's public information.

## COUNT IV
## Mandamus

116.    Plaintiff hereby incorporates by reference the foregoing paragraphs of the Complaint as if set forth herein.

117.    The Mandamus Act, 28 U.S.C. § 1361, vests this Court with original jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

118.    The All Writs Act, 28 U.S.C. § 1651, authorizes this Court to issue all writs "necessary or appropriate" in aid of its jurisdiction.

119.    The amended Case Act imposes mandatory duties on Defendants to post online the text and detailed information on supporting legal authorities for binding and non-binding international agreements.

120.    Defendants' refusal to fulfill their statutory obligations and their ongoing failure to post required agreement text and information on a public website violate the clear duties imposed by the Act.

121.    Mandamus is warranted "to correct transparent violations of a clear duty to act" by federal officials. *In re Aiken Cnty.*, 725 F.3d 255, 258 (D.C. Cir. 2013) (quotations omitted).

122.    If relief is not available on Plaintiff's other counts, Plaintiff is entitled to a writ of mandamus.

123.    Plaintiff is entitled to a writ of mandamus compelling Defendants to comply with the Act's requirements; and, absent this Court granting the relief sought by the counts above, there is no other adequate means of redress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

A.    Declare unlawful, vacate, and set aside Defendants' decision not to operate and maintain the international agreements websites required by the amended Case Act, including Defendants' refusal and failure to post agreement text and accompanying legal authority information;

B.      Order Defendants to post all overdue agreement text and accompanying legal authority information within five business days, and to timely post all covered agreement text and accompanying legal authority information on a forward-going basis within 120 days of the agreement's effective date;

C.      Award Plaintiff its costs and reasonable attorneys' fees; and

D.      Grant such other and further relief as this Court may deem just and proper.

Date: March 6, 2026

Respectfully Submitted,

*/s/ Nikhel S. Sus*

Nikhel S. Sus (D.C. Bar No. 1017937)
Yoseph T. Desta (D.C. Bar No. 90002042)
CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON
P.O. Box 14596
Washington, D.C. 20044
Telephone: (202) 408-5565
Fax: (202) 588-5020
nsus@citizensforethics.org
ydesta@citizensforethics.org

*Counsel for Plaintiff*