**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| THE LAWFARE INSTITUTE, | |
| *Plaintiff*, | |
| v. | Case No. 26-cv-00798-JEB |
| UNITED STATES DEPARTMENT OF STATE, *et al.*, | **HEARING REQUESTED** |
| *Defendants*. | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...............................................................................................................ii

INTRODUCTION ........................................................................................................................... 1

BACKGROUND .............................................................................................................................. 2

I.  Statutory Background ....................................................................................................... 2

II. Factual Background .......................................................................................................... 5

STANDARD OF REVIEW ............................................................................................................. 6

ARGUMENT................................................................................................................................... 7

I.  Lawfare has Standing......................................................................................................... 7

    A.  Lawfare has Plausibly Alleged Informational Standing ........................................... 8

    B.  State's Challenges to Lawfare's Standing Lack Merit ........................................... 10

II. State's Failure to Publish Covered Materials Constitutes Final Agency Action .............. 14

III. Lawfare States an APA Claim for Failure to Comply with the Case Act........................ 17

IV. Lawfare States an APA Claim for Unlawful Withholding or Unreasonable Delay ......... 17

V.  APA Claims Based on Violations of the Paperwork Reduction Act Are Permissible ..... 20

VI. Absent Other Relief, Lawfare Is Entitled to a Writ of Mandamus .................................. 21

CONCLUSION............................................................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

*In re Aiken Cnty.*,
  725 F.3d 255 (D.C. Cir. 2013) .................................................................................................21

*Am. Nat'l Ins. Co. v. F.D.I.C.*,
  642 F.3d 1137 (D.C. Cir. 2011) ...........................................................................................6, 12

*Arpaio v. Obama*,
  797 F.3d 11 (D.C. Cir. 2015) ...................................................................................................6

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................................................6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................................................................6

*Campaign for Accountability v. DOJ*,
  155 F.4th 724 (D.C. Cir. 2025).............................................................................................11

*CREW v. DOJ*,
  846 F.3d 1235 (D.C. Cir. 2017).................................................................................8, 10, 17

*CREW v. OMB*,
  791 F. Supp. 3d 29 (D.D.C. 2025).........................................................................9, 20, 21

*CREW v. OMB*,
  No. 25-5266 (D.C. Cir.) ........................................................................................9, 20, 21

*Ctr. for Biological Diversity v. Tidwell*,
  239 F. Supp. 3d 213 (D.D.C. 2017) .......................................................................................17

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*,
  77 F.4th 679 (D.C. Cir. 2023)..................................................................................... *passim*

*Da Costa v. Immigr. Inv. Program Off.*,
  643 F. Supp. 3d 1 (D.D.C. 2022)...........................................................................................18

*Da Costa v. Immigr. Inv. Program Off.*,
  80 F.4th 330 (D.C. Cir. 2023)................................................................................................18

*Dearth v. Holder*,
  641 F.3d 499 (D.C. Cir. 2011)...............................................................................................12

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019).................................................................................................................7

*Diamond Alt. Energy, LLC v. EPA*,
  606 U.S. 100 (2025)...............................................................................................................14

*Dib v. Shea*,
  No. 25-cv-4167 (JEB), 2026 WL 1578859 (D.D.C. June 2, 2026) .....................................2, 19

*Drs. for Am. v. OPM*,
  766 F. Supp. 3d 39 (D.D.C. 2025).........................................................................................20

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
  266 F. Supp. 3d 297 (D.D.C. 2017).....................................................................................8, 19

*Harris v. D.C. Water & Sewer Auth.*,
  791 F.3d 65 (D.C. Cir. 2015)...................................................................................................7

**Cases—continued**

*Lewis v. U.S. Parole Comm'n*,
743 F. Supp. 3d 181 (D.D.C. 2024) ...............................................................................15

*Liberty Fund, Inc. v. Chao*,
394 F. Supp. 2d 105 (D.D.C. 2005) ................................................................................19

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........................................................................................................10

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ........................................................................................................14

*N. Am. Butterfly Ass'n v. Wolf*,
977 F.3d 1244 (D.C. Cir. 2020) .......................................................................................7

*Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA*,
752 F.3d 999 (D.C. Cir. 2014) ........................................................................................15

*Nat'l Women's L. Ctr. v. OMB*,
358 F. Supp. 3d 66 (D.D.C. 2019) ..................................................................................20

*Nat'l Women's L. Ctr. v. OMB*,
No. 19-5130, 2020 WL 13561758 (D.C. Cir. June 9, 2020) ...........................................20

*Owner-Operator Indep. Drivers Ass'n, Inc. v. DOT*,
879 F.3d 339 (D.C. Cir. 2018) ...................................................................................12, 13

*Phang v. Blanche*,
No. 26-1417 (EGS), 2026 WL 1831251 (D.D.C. June 25, 2026) ............................8, 10, 17

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
489 F.3d 1279 (D.C. Cir. 2007) ........................................................................................8

*Pub. Citizen v. DOJ*,
491 U.S. 440 (1989) ........................................................................................................12

*Shoshone-Bannock Tribes v. Reno*,
56 F.3d 1476 (D.C. Cir. 1995) ........................................................................................15

*Sierra Club v. Thomas*,
828 F.2d 783 (D.C. Cir. 1987) ................................................................................2, 14, 15

*Steele v. United States*,
144 F.4th 316 (D.C. Cir. 2025) ....................................................................................2, 20

*Telecomms. Rsch. & Action Ctr. v. FCC*,
750 F.2d 70 (D.C. Cir. 1984) .................................................................................18, 19, 20

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ......................................................................................................7, 11

*Valero Energy Corp. v. EPA*,
927 F.3d 532 (D.C. Cir. 2019) ........................................................................................16

*Waterkeeper All. v. EPA*,
853 F.3d 527 (D.C. Cir. 2017) ..........................................................................................9

**Statutes, Rules, and Regulations**

1 U.S.C.

§ 112a............................................................................................................................3

§ 112b............................................................................................................................1

§ 112b(b)(1)................................................................................................................5, 9

§ 112b(b)(2)................................................................................................................4, 9

§ 112b(d)......................................................................................................................13

§ 112b(e)........................................................................................................................5

§ 112b(k)(5)...................................................................................................................4

5 U.S.C.

§ 551(13)....................................................................................................................2, 14

§ 706(1)........................................................................................................................17

44 U.S.C. § 3506(d)(1) ...............................................................................................21

Pub L. No. 100-204, § 139, 101 Stat. 1331, 1347 (Dec. 22, 1987) ..............................3

Pub L. No. 81-822, Ch. 1001, §112a, 64 Stat. 980 (Sept. 23, 1950) ...........................3

Pub. L. No. 92-403, § 1, 86 Stat. 619 (Aug. 22, 1972)................................................2

Pub. L. No. 95-426, § 708, 92 Stat. 963, 993 (Oct. 7, 1978)......................................3

Pub. L. No. 117-263, § 5947, 136 Stat. 2395, 3476 (Dec. 23, 2022) ...........................4

Fed. R. Civ. P.

12(b)(1) .........................................................................................................................6

12(b)(6) ...................................................................................................................6, 7, 14

Local Civ. R. 7(f) .........................................................................................................2

22 C.F.R. § 181 .............................................................................................................5

§ 181.9(a).......................................................................................................................5

§ 181.9(b) ......................................................................................................................5

§ 181.9(c) ......................................................................................................................5

67 Fed. Reg. 8452 (Feb. 22, 2002) .............................................................................21

**Other Authorities**

Curtis A. Bradley, *Amendments to the Case-Zablocki Act Concerning Reporting and Publication of International Agreements and Related Regulations (U.S.),* 63 Int'l Legal Materials 275 (2024) .......................................................................3, 4

OMB, *Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies* ...........................21

Oona A. Hathaway, Curtis A. Bradley & Jack L. Goldsmith, *The Failed Transparency Regime for Executive Agreements: An Empirical and Normative Analysis*, 134 Harv. L. Rev. 629, 649-51 (2020) ........................................................2

S. Comm. on Foreign Relations, 106th Cong., 2d sess., *Treaties and Other International Agreements: The Role of the United States Senate* 217 (S. Prt. 2002) ...........................................................................................................................3

S. Comm. on Foreign Relations., 117th Cong. 2d Sess., *Enhancing Transparency on International Agreements and Non-Binding Instruments* 5 (Comm. Print 2022) .............................................................................................................2, 4, 10, 19

iv

**INTRODUCTION**

Defendants' Motion to Dismiss confirms the straightforward nature of this suit: the Case-Zablocki Act ("Case Act"), 1 U.S.C. § 112b, requires the State Department ("State") to publicly disclose all covered international agreements and qualifying non-binding instruments within a specific timeframe, and State has failed to comply fully with that non-discretionary statutory duty. Rather than simply acknowledge its legal obligations and comply with them, State advances a series of legally defective arguments aimed at shielding its noncompliance from judicial review. State primarily argues that Plaintiff, the Lawfare Institute ("Lawfare"), has not identified a formal, across-the-board policy as the source of its noncompliance. Defs.' Mem. at 5-7, ECF No. 9-1. But this argument fundamentally misconstrues the claims alleged in the Complaint, and, in any event, is legally untenable. Federal law requires State to disclose covered agreements, and State's failure to do so is unlawful, regardless of the existence of any generally applicable policy requiring noncompliance with the Case Act.

State's related arguments challenging Lawfare's standing run headlong into binding D.C. Circuit precedent recognizing standing for organizations in materially identical situations. "[I]nformational injury [is] sufficient to satisfy standing," and "when a plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute, they are injured." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 685 (D.C. Cir. 2023) ("*CBD*") (cleaned up). The Court should also reject State's argument that Lawfare's injuries are not redressable because other components of the Executive Branch, including the Executive Office of the President, may be violating their own statutory duties to transmit concluded agreements to State for publication. Defs.' Mem. at 12-13. That multiple parts of the Executive Branch (as opposed to just State) may be simultaneously violating their statutory obligations is not a legitimate basis for dismissal.

State's arguments that Lawfare fails to state a claim under the Administrative Procedure Act ("APA") fare no better. The argument that noncompliance with a statutory disclosure requirement cannot constitute "final agency action," Defs.' Mem. at 13-17, conflicts with the plain

1

language of the APA and D.C. Circuit precedent, which make clear that "agency action" includes the "failure to act," *see* 5 U.S.C. § 551(13), and failing to act within a mandatory timeframe "triggers 'final agency action' review." *Sierra Club v. Thomas,* 828 F.2d 783, 793 (D.C. Cir. 1987). The argument that State's disclosure delays are reasonable and thus immune from APA review, Defs.' Mem. at 17-20, ignores the maxim that when "Congress has dictated how long a decision should take and the agency blows through that deadline, then that fact alone suggests unreasonableness." *Dib v. Shea*, No. 25-cv-4167 (JEB), 2026 WL 1578859, at *5 (D.D.C. June 2, 2026). And the argument that Lawfare lacks an APA cause of action to seek redress for violations of the Paperwork Reduction Act ("PRA"), Defs.' Mem. at 20–22, is foreclosed by D.C. Circuit precedent holding that that "the PRA does not bar judicial review" of all APA claims alleging a PRA violation. *Steele v. United States*, 144 F.4th 316, 322–24 (D.C. Cir. 2025).

Because this Court has jurisdiction and because Lawfare has plausibly alleged claims upon which relief can be granted, the Court should deny State's Motion to Dismiss.[1]

## BACKGROUND

### I. Statutory Background

Congress enacted the Case Act in 1972. *See* Pub. L. No. 92-403, § 1, 86 Stat. 619 (Aug. 22, 1972). Its enactment responded to the rising number of international agreements executed by the United States that took the form of an "executive agreement," rather than a Senate-approved treaty. S. Comm. on Foreign Relations, 117th Cong. 2d Sess., *Enhancing Transparency on International Agreements and Non-Binding Instruments* 5 (Comm. Print 2022). The Act also addressed Congressional concerns that, during the Vietnam War, the Executive Branch was executing various executive agreements in secret, without congressional knowledge. *See, e.g.*, Oona A. Hathaway, Curtis A. Bradley & Jack L. Goldsmith, *The Failed Transparency Regime for Executive Agreements: An Empirical and Normative Analysis*, 134 Harv. L. Rev. 629, 649-51 (2020). The Case Act mandated congressional reporting of certain executive agreements to

---

[1] Plaintiff requests an oral hearing on Defendants' motion. *See* Local Civ. R. 7(f).

"restor[e] a proper working relationship between the Congress and the executive branch in the area of foreign affairs." *See* S. Comm. on Foreign Relations, 106th Cong., 2d sess., *Treaties and Other International Agreements: The Role of the United States Senate* 217 (S. Prt. 2002).

In its original form, the Case Act required the Executive Branch to report covered executive agreements to Congress within 60 days after the agreements took effect. But implementation issues involving "late reporting and under-reporting of agreements" led Congress to strengthen the Case Act on several occasions, including by requiring a written explanation of untimely reports and imposing funding cutoffs to induce better compliance. *See generally* Curtis A. Bradley, *Amendments to the Case-Zablocki Act Concerning Reporting and Publication of International Agreements and Related Regulations (U.S.)*, 63 Int'l Legal Materials 275, 276 (2024) ("*Amendments to the Case Act*"); *see also* Pub. L. No. 95-426, § 708, 92 Stat. 963, 993 (Oct. 7, 1978) (requiring explanation of late transmittals); Foreign Relations Authorization Act, Fiscal Years 1988 and 1989, Pub L. No. 100-204, § 139, 101 Stat. 1331, 1347 (Dec. 22, 1987) (imposing funding restrictions for Case Act noncompliance). Despite these efforts, studies assessing the Executive Branch's compliance with the Case Act revealed that, in the nearly 30-year period from 1989 to early 2017, reporting "had continued to be late and incomplete." Bradley, *Amendments to the Case Act* 276. Moreover, the Executive Branch interpreted the Case Act as inapplicable to non-binding international agreements, resulting in "a potentially large loophole in the transparency regime." *Id.*

A separate public reporting statute, originally enacted in 1950 and codified at 1 U.S.C. § 112a, required State to publish a yearly compilation of treaties and "all international agreements other than treaties to which the United States is a party that have been signed, proclaimed, or with reference to which any other final formality has been executed." *See* Pub L. No. 81-822, Ch. 1001, §112a, 64 Stat. 980 (Sept. 23, 1950). As with the Case Act, Congress at various times amended and attempted to strengthen this public reporting statute, but it too had proven to be largely ineffectual due to its multiple exemptions and its inapplicability to non-binding executive

3

agreements, resulting in incomplete or untimely publication of covered material. *See* Bradley, *Amendments to the Case Act* 276.

To address these shortcomings in the reporting and publication regimes and to ensure that "efforts to advance U.S. interests through" the use of agreements with "allies, partners, and other actors" are "conducted with accountability to Congress and, to the greatest extent appropriate, transparency for the public," Congress expanded and strengthened the Case Act's reporting and transparency requirements through passage of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023. *See* Pub. L. No. 117-263, § 5947, 136 Stat. 2395, 3476 (Dec. 23, 2022); S. Comm. on Foreign Relations, *Enhancing Transparency on International Agreements and Non-Binding Instruments* 1. The 2022 Case Act amendments imposed several significant new transparency mandates for covered international agreements and qualifying non-binding instruments. Of particular importance to this case, the amended statute provides, among other things, that:

- To close the disclosure loopholes for non-binding agreements, the Case Act expressly applies, with limited exceptions, to "qualifying non-binding instruments," broadly defined as instruments that "could reasonably be expected to have a significant impact on the foreign policy of the United States" or are subject to a written request from a relevant congressional committee, 1 U.S.C. § 112b(k)(5);

- For "qualifying non-binding instruments," State must publish on its website the text of the instrument and information relating to its legal authority "[n]ot less frequently than once every 120 days . . . of each qualifying non-binding instrument that became operative during the preceding 120 days," *id.* § 112b(b)(2);

- For "international agreements," which are defined to include Senate-approved treaties or any other international agreements to which the United States is a party, State must publish on its website the text of the agreement and information relating

4

to its legal authority "[n]ot later than 120 days after the date on which an international agreement enters into force," *id.* § 112b(b)(1); and

- Federal departments and agencies must better coordinate on covered agreements, including by transmitting to the State Department any executive agreements or qualifying non-binding instruments entered into within fifteen days of concluding the agreement, along with a detailed description of the legal authority that provides authorization for the agreement, and requiring each department or agency that concludes such agreements to appoint a "Chief International Agreements Officer" to ensure compliance with these obligations, *id.* § 112b(e).

State has promulgated regulations implementing the amendments to the Case Act and assigning individual components responsibilities for the timely publication of the information covered by the Act. *See* 22 C.F.R. Pt. 181. The regulations direct State's Office of the Assistant Legal Adviser for Treaty Affairs to publish the text of international agreements, *id.* § 181.9(a), and the Bureau of Administration to publish the text of qualifying non-binding instruments and relevant legal authority information for all agreements and instruments, *id.* §§ 181.9(b)-(c).

## II. Factual Background

The Trump-Vance Administration has continued the practice of executing both international agreements and non-binding instruments with foreign partners as a tool of U.S. foreign policy. *See* Compl. ¶¶ 9-10. Under this Administration, however, State has not complied fully and consistently with its Case Act transparency obligations. *Id.* ¶ 11. For example, State did not update either the international agreements website or the qualifying non-binding agreements website *at all* in the first several months of 2025. *Id.* ¶ 86 (noting that the websites for binding and non-binding agreements had zero 2025 posts as of April 1, 2025, and March 4, 2025, respectively). As alleged in the Complaint, and as must be presumed to be true at the pleadings stage, senior federal officials have identified publicly multiple agreements or instruments that qualify for publication under the Case Act and that remain unpublished, well beyond the statutory deadlines.

5

*See* Compl. ¶¶ 9, 10, 91, 93 (citing examples of publicized agreements with the Philippines, Bahrain, Malaysia, the European Union, Panama, Qatar, Saudi Arabia, Ukraine, and others).

Access to these agreements and instruments is critical to Lawfare's work and core mission. Lawfare is a non-profit education organization. Compl. ¶ 17. It produces multimedia publications, podcasts, and livestreams, and it disseminates nonpartisan analysis to help inform the U.S. public and policy makers on a host of topics, including national security law, threats to democracy, cybersecurity, executive powers, content moderation, domestic extremism, and foreign policy. *Id.* ¶ 18. As part of its core mission of informing public understanding of the operations and activities of the federal government, Lawfare has specifically covered and relied on public disclosure of Case Act materials. *Id.* ¶ 19. State's noncompliance with its Case Act disclosure obligations directly impedes Lawfare's ability to execute its core mission, and Lawfare filed the instant suit to rectify that noncompliance.

### STANDARD OF REVIEW

State moves to dismiss the Complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. To survive a motion to dismiss under Rule 12(b)(1), a plaintiff must establish that the court has subject matter jurisdiction over the claims asserted. *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). In deciding a Rule 12(b)(1) motion, the court will "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged' and upon such facts determine jurisdictional questions." *Am. Nat'l Ins. Co. v. F.D.I.C.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005) (cleaned up)).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). When considering

6

a Rule 12(b)(6) motion, a court must "accept the operative complaint's well-pleaded factual allegations as true and draw all reasonable inferences in the [plaintiff's] favor." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020). Factual disputes generally cannot be resolved on a motion to dismiss, as a court's "role is not to speculate about which factual allegations are likely to be proved after discovery." *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 70 (D.C. Cir. 2015).

## ARGUMENT

### I.    Lawfare has Standing

State's contention that Lawfare lacks standing fails under clear, binding D.C. Circuit precedents on informational standing. As a nonprofit dedicated to studying, analyzing, and publishing content regarding the Executive Branch's foreign affairs and foreign policy powers and activities, Lawfare routinely relies on publicly disseminated federal records in carrying out its mission. Compl. ¶ 101. Lawfare has been and will continue to be harmed by State's noncompliance with the Case Act's public disclosure requirements, and those injuries are capable of being redressed by this Court. Accordingly, Lawfare plainly has standing to challenge State's noncompliance with the Case Act.

To establish Article III standing, a plaintiff must show (1) "injury in fact that is concrete, particularized, and actual or imminent," (2) "that the injury was likely caused by the defendant," and (3) "that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "[F]uture injuries" satisfy standing where the threat of harm is "certainly impending, or there is a substantial risk that the harm will occur." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019). "For purposes of standing," the Court must "assume the merits in favor of the plaintiff." *CBD*, 77 F.4th at 685. The "standing inquiry focuses on whether the plaintiff has demonstrated an injury at the outset of the litigation, so post-filing developments . . . do not undercut standing." *N. Am. Butterfly Ass'n*, 977 F.3d at 1258 (cleaned up).

7

### A.  Lawfare has Plausibly Alleged Informational Standing

"[T]he Supreme Court" has "held informational injury sufficient to satisfy standing." *CBD*, 77 F.4th at 685 (citing, among other cases, *FEC v. Akins*, 524 U.S. 11, 24 (1998)). "To prove an informational injury, a plaintiff must show that (1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Id.* (cleaned up). A plaintiff "need not receive a specific denial" of information from an agency "to sustain an informational injury." *Id.* at 686. Rather, "when a plaintiff 'fails to obtain information which must be publicly disclosed pursuant to a statute,' they are injured." *Id.*; *see also CREW v. DOJ*, 846 F.3d 1235, 1242 (D.C. Cir. 2017) (finding informational injury exists when an agency adopts a "'policy or practice' [that] 'will impair the [plaintiff's] lawful access to information in the future'") (citing *Newport Aeronautical Sales v. Air Force*, 684 F.3d 160, 164 (D.C. Cir. 2012) (cleaned up)). "[T]he fact that a number of people could be similarly injured does not render the claim an impermissible generalized grievance[.]" *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1292 (D.C. Cir. 2007). Informational injury may be concrete and particularized even under a statute that "entitles the public generally to the disclosure of" the information. *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 311 (D.D.C. 2017); *see also Phang v. Blanche,* No. 26-1417 (EGS), 2026 WL 1831251, at *10 (D.D.C. June 25, 2026) (plaintiff can establish standing based on informational injuries arising from the government's alleged noncompliance with a mandatory disclosure statute).

Lawfare easily meets the two-part test for informational standing. First, Lawfare has been deprived of information that a federal statute requires the government to disclose. Compl. ¶¶ 9, 10, 91, 93 (identifying covered material that State has failed to disclose in compliance with the Case Act). State's failure to comply with the Case Act's public disclosure requirements impairs Lawfare's "lawful access to information," and State's continued noncompliance will continue to impair that access "in the future." *CREW*, 846 F.3d at 1242. As explained above, the Case Act

mandates timely public disclosure of the text and relevant supporting legal materials of covered international agreements and qualifying non-binding instruments. 1 U.S.C. §§ 112b(b)(1)-(2). By withholding covered information from disclosure, State has defied the Case Act's disclosure mandates, resulting in a cognizable injury to Lawfare. *See Waterkeeper All. v. EPA,* 853 F.3d 527, 534 (D.C. Cir. 2017) (plaintiff had informational standing to challenge agency action that "had the automatic effect of cutting back on [statutory] reporting and disclosure requirements" and thus "deprive[d] [the plaintiff] of information, the public disclosure of which would otherwise be required by [statute]"); *CREW v. OMB*, 791 F. Supp. 3d 29, 51 (D.D.C. 2025) (nonprofit government watchdog organization had informational standing to challenge agency's takedown of statutorily required public website disclosing federal spending allocations), *appeal docketed*, No. 25-5266 (D.C. Cir.).

Lawfare's "primary organizational purpose . . . is to educate and inform the American people, and improve public discourse, on legal and policy issues relating to the country's engagement with countries around the world, including for the purpose of enhancing American participatory democracy with respect to those issues." Compl. ¶ 101. In carrying out that core function, Lawfare has a demonstrated history of relying on publications made under the Case Act to assess covered international agreements. *Id.* ¶ 102. Depriving Lawfare of that statutorily required information severely impairs its ability to carry out its core mission. *Id.* ¶ 103. And "this is not merely a retrospective issue, but a going-forward one as well," because future depravation of information about existing or anticipated agreements will have the same injurious effect. *Id.* ¶ 95. Thus, interfering with Lawfare's mission by unlawfully withholding information subject to the Case Act's disclosure obligations amounts to cognizable legal injury. *Waterkeeper,* 853 F.3d at 533.

Second, Lawfare "suffers, by being denied access to [Case Act] information," precisely the "type of harm[s] Congress sought to prevent by requiring disclosure" of the text and related legal authority information for covered international agreements and non-binding instruments. *CBD*, 77 F.4th at 685. Congress included the public disclosure provisions in the 2022 amendments to the

9

Case Act to afford the public "greater understanding of the use of international accords as a foreign policy tool," which is "essential to our democracy" and "will lead to a stronger and more sustainable foreign policy." S. Comm. on Foreign Relations, *Enhancing Transparency on International Agreements and Non-Binding Instruments* 1, 5.  The 2022 amendments sought to prevent the exact outcome that has resulted from State's noncompliance—allowing the Executive Branch to conclude agreements on behalf of the American people in secret, with little or no transparency or accountability. *Id.*

Lawfare also satisfies the causation and redressability requirements for standing. The harms asserted are "fairly traceable to the challenged action" because State's failure to disclosure Case Act material within the statutory timeframe deprives Lawfare of information it is entitled to receive. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). And Lawfare's injuries can be "redressed by [this Court's] favorable decision" because the Court can require State to abide by its statutory disclosure requirements. *Id.* at 561*; see also infra* at 13.

### B.  State's Challenges to Lawfare's Standing Lack Merit

State advances several arguments challenging Lawfare's standing, all which are meritless. First, State argues that Lawfare lacks standing because it has not sufficiently alleged the existence of an "across-the-board decision or policy" of noncompliance with the Case Act. Defs.' Mem. at 6-7. In support of this argument, State notes that its sporadic and untimely disclosure of some Case Act material is evidence that no such generally applicable noncompliance policy exists. *Id.* This argument—that standing to challenge an agency's noncompliance with a statutory disclosure requirement cannot exist so long as the noncompliance occurs in piecemeal fashion rather than consistently pursuant to formal policy—is patently unreasonable and, unsurprisingly, State cites no legal authority whatsoever in support of it.

The D.C. Circuit has routinely recognized that a plaintiff may challenge an agency "policy *or practice*" that impairs a plaintiff's lawful access to information. *CREW*, 846 F.3d at 1242 (emphasis added); *see also Phang,* 2026 WL 1831251, at *10 (plaintiff has standing to challenge government's failure to disclose materials in violation of federal statute). The Complaint contains

robust allegations that State has failed to disclose individual agreements as part of a broader practice of failing to comply fully with its Case Act disclosure obligations. *See, e.g.*, Compl. ¶ 86 (State "did not update the international agreements websites at all in the first several months of 2025"); *id.* ¶ 87 (State "abruptly stopped posting agreements when the July 2025 RIF occurred, and it has only partially and sporadically resumed posting in recent months"). These allegations must be accepted as true for purposes of a motion to dismiss, and it is immaterial to Lawfare's claims whether State's practice of noncompliance resulted from an across-the-board policy or from some other reason, such as under-staffing, administrative oversight, intentional noncompliance, or general negligence.

Second, State contends that a plaintiff asserting informational injury also "must establish 'downstream consequences' from its failing to receive the information in question." Defs.' Mem. at 7 (quoting, among other cases, *TransUnion,*, 594 U.S. at 442). But the D.C. Circuit has rejected that informational standing requires a separate showing of "downstream consequences." *Campaign for Accountability v. DOJ*, 155 F.4th 724, 743 (D.C. Cir. 2025). That is because the Supreme Court has "specifically distinguished *TransUnion* from cases that involve denial of information subject to *public-disclosure or sunshine laws* that entitle all members of the public to certain information." *Id.* (emphasis in original) (cleaned up). Where a public disclosure law, like the Case Act, is at play, the Supreme Court has "never suggested" that a showing of downstream consequences is required, and the D.C. Circuit has rejected the need for such a showing. *Id.* (quoting *Pub. Citizen v. DOJ*, 491 U.S. 440, 449 (1989)). In any event, even if such a showing were required here, as explained *supra* at 9-10, the Complaint contains ample factual allegations explaining how the deprivation of Case Act information has and will continue to impair Lawfare's core functions.

Third, State argues that Lawfare fails to assert a cognizable informational injury because it has not sufficiently alleged past noncompliance with the Case Act or alleged that State "will not comply going forward." Defs. Mem. at 8. But the Complaint contains robust allegations of past and on-going noncompliance and supports those allegations with numerous examples of State's

11

failure to disclose covered information. *See, e.g.*, Compl. ¶¶ 8-10, 85-94. The Complaint also contains direct allegations relating to future noncompliance. *Id.* ¶ 95 (identifying numerous recent or impending agreements subject to the Act's disclosure requirements). These allegations, which must also be accepted as true, amply support Lawfare's claims.

State also argues that the Case Act has many conditions and potential exceptions that could affect whether an individual agreement is subject to the Act's publication requirements. Defs.' Mem. at 8-10. That is true, but inapposite. That the Case Act contains conditions and exceptions does not foreclose a plaintiff's ability to establish standing to challenge State's noncompliance with the Act. The Supreme Court rejected a nearly identical argument in *Public Citizen*, holding that the existence in a sunshine statute of exceptions or conditions on disclosure does not "excuse[] noncompliance with [the statute's] provisions." 491 U.S. at 450. Lawfare has asserted that the agreements identified in the Complaint are subject to the disclosure provisions of the Case Act, that State has not timely disclosed them, and that State has engaged in a pattern of noncompliance with its disclosure obligations. At this stage in the litigation, the Court must assume the truth those factual allegations and "construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged[.]" *Am. Nat'l Ins. Co.*, 642 F.3d at 1139 (cleaned up).

Fourth, State contends that Lawfare lacks standing to seek prospective relief because it has not sufficiently alleged an entitlement to information about a specific, individual agreement and an imminent threat that it will be denied that information. Defs.' Mem. at 12 (citing *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011) (challenge to an agency rule requiring the provision of a U.S. address as a prerequisite to the purchase of firearm)). In *Dearth,* the D.C. Circuit held that the plaintiff had standing to challenge an agency regulation because the plaintiff could "show he is suffering an ongoing injury or faces an immediate threat of injury." *Id.* Courts have applied a similar standard where a plaintiff seeks prospective relief in the informational injury context. *See, e.g., Owner-Operator Indep. Drivers Ass'n, Inc. v. DOT*, 879 F.3d 339, 346 (D.C. Cir. 2018) (plaintiff need only show that its informational injury "is continuing or imminent") (citing *Steel*

12

*Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998) (cleaned up)). Moreover, a plaintiff "*need not receive a specific denial*" of information from an agency "to sustain an informational injury*,*" rather "a plaintiff has informational standing, so long as the plaintiff has a statutory right to seek the information that the agency withheld." *CBD*, 77 F.4th at 686 (emphasis added).

Lawfare easily satisfies the "continuing or imminent" standard. The Complaint contains extensive allegations of past, present, and imminent future harm: it alleges that State's noncompliance with the Case Act began near the start of the current Administration, Compl. ¶¶ 80-87; that State is currently violating its mandate to publish Case Act material, *id.* ¶¶ 88-94; and that State will imminently fail to disclose pending or recently completed agreements, consistent with its recent practice of Case Act noncompliance, *id.* ¶ 95. These allegations are sufficient to establish a "continuing or imminent" informational injury. *Owner-Operator Indep. Drivers Ass'n, Inc.*, 879 F.3d at 346.

Fifth, State asserts that Lawfare's harms are not redressable by a court order because some Case Act agreements or instruments may be in the possession of the Executive Office of the President ("EOP") or another federal agency, and the EOP or other agency may be violating the Case Act's requirement to transmit that material to State for publication. Defs.' Mem. at 12-13; 1 U.S.C. § 112b(d) (requiring transmittal to State of any covered agreements or instruments within a particular timeline). Thus, according to State, the possibility that the EOP or other agencies may be violating their statutory transmission obligations is sufficient to defeat Lawfare's standing on redressability grounds because those other agencies and the EOP are not named defendants in this suit. *Id.*

This "two wrongs make a right" argument—that the Court is powerless to rectify State's violations because the EOP and several other federal agencies might also be violating federal law—is unsustainable. As an initial matter, whether the EOP or other federal agencies are in fact violating their statutory transmission obligations, thereby causing State to violate its disclosure obligations, is a question of fact that is inappropriate for resolution at the motion to dismiss stage. In any event, a court order will redress Lawfare's injuries in several substantive ways.  An order

13

will directly redress injuries arising from the universe of covered agreements or instruments that are within State's possession or that come within State's possession. *See Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025) (plaintiff need only show requested relief would likely redress injury *at least partially*). And even with respect to covered agreements or instruments that the EOP or another agency may be unlawfully refusing to transmit to State, a court order requiring State to come into full compliance with the Case Act's disclosure obligations would likely induce the EOP or other federal agency to execute their transmission obligations. This likelihood alone is sufficient to establish redressability. *Id.; see also Massachusetts v. EPA*, 549 U.S. 497, 526 (2007) (finding standing where the "risk [of harm] would be *reduced to some extent* if petitioners received the relief they seek") (emphasis added). Finally, assuming the Court orders State to comply with its disclosure obligations, and State confirms that compliance is impossible due to the EOP's or another agency's refusal to abide by its Case Act transmission requirements, the Court can consider whether other remedial measures are necessary and available at that stage in the litigation, including whether the EOP or other agencies must be joined as parties or whether the Court may exercise other inherent or statutory powers to effectuate its orders. But dismissing the case now on the grounds that the Court is incapable of redressing potentially cascading violations of federal law would encourage further unlawful behavior and facilitate the Executive's ability to enter into "secret agreements," which is the exact type of activity the Case Act's transparency provisions were designed to proscribe.

## II.   State's Failure to Publish Covered Materials Constitutes Final Agency Action

In seeking dismissal under Rule 12(b)(6), State argues primarily that its failure to disclose Case Act information within the statutory timeframe cannot constitute "final agency action" under the APA. Defs.' Mem. at 13-17. This argument contradicts the plain text of the APA and binding precedent of the D.C. Circuit. The APA expressly defines "agency action" as including the "failure to act." 5 U.S.C. § 551(13). The D.C. Circuit has made clear that failing to act within a mandatory timeframe imposed by a federal statute constitutes "final agency action." *See Sierra Club v. Thomas,* 828 F.2d 783, 793 (D.C. Cir. 1987) ("[Where] an agency is under an unequivocal

14

statutory duty to act, failure so to act constitutes, in effect, an affirmative act that triggers 'final agency action' review."); *Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476, 1481 n.4 (D.C. Cir. 1995) ("Under the [APA] . . . final agency actions . . . includ[e] an agency's failure to act") (cleaned up); *see also infra* at 16.

Here, the Case Act imposes on State an "unequivocal statutory duty" to publish covered agreements and instruments within a specific timeline, and State's failure to act within that timeframe "triggers 'final agency action' review." *Sierra Club,* 828 F.2d at 793. State attempts to overcome the APA's statutory text and relevant circuit precedent by again pointing to the alleged lack of a formal, across-the-board policy of noncompliance with Case Act. Defs.' Mem. at 14. But, as explained above, *supra* at 10, the existence or non-existence of such a policy is immaterial to whether State failed to act within the statutory timeframe and cannot excuse State's noncompliance with its statutory obligations.

State also suggests that its failure to publish Case Act material cannot constitute final agency action because, even assuming "there is indeed a statutory obligation to publish any of these specific agreements . . . that process may simply be delayed." Defs.' Mem. at 15. Although State does not expand further on that point, presumably its argument is that any such delay is somehow reasonable, thereby rendering its failure to publish incapable of being considered a "final agency action." But the D.C. Circuit has directly rejected that style of argument. *Sierra Club,* 828 F.2d at 793; *see also Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 198 (D.D.C. 2024) (an agency's "failure to abide by its 'unequivocal statutory duty to act' . . . is the 'functional equivalent of final agency action' . . . which may be challenged under [the APA]") (citing *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 10 (D.D.C. 2008) (cleaned up). Moreover, "[a]n agency action may be final even if the agency's position is 'subject to change' in the future." *Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1006 (D.C. Cir. 2014). Thus, that State might one day overcome its "delay" and publish the relevant agreements and instruments in accordance with its statutory obligations is no basis to conclude that its current failure to act is non-final.

15

Finally, State contends that an agency's decision to withhold information from public disclosure, "even if wrongly decided," can never constitute final agency action because the practical effect of nondisclosure is to "leave the world just as [the parties] found it." Defs.' Mem. at 16 (citing *Valero Energy Corp. v. EPA*, 927 F.3d 532, 536 (D.C. Cir. 2019) ("*Valero*"). According to State, the decision to withhold publication of Case Act material "whether rightly or wrongly" does not amount to final agency action because it "do[es] not in any way alter the relationship between the parties, the legal obligations of the Defendants to comply with the Act, or any legal entitlement the Plaintiff carries under the Act." *Id.* at 16-17. That argument is demonstrably incorrect, and, if accepted, would result in a fundamental shift in federal jurisprudence relating to statutes concerning access to government information.

As an initial matter, the only case State cites in support of its argument, *Valero*, is not pertinent. *Valero* did not involve an agency's decision to withhold information in contravention of a statutory disclosure requirement. It involved an EPA-issued document providing the agency's interpretation of a statutory provision concerning the amount of renewable fuel that must be included in gasoline sold in the United States. *Valero*, 927 F.3d at 534. The *Valero* court held that issuance of the interpretive document did not constitute final agency action because the document "imposes no obligations, prohibitions, or restrictions; it compels action by neither the recipient nor the agency," and therefore imposed no legal consequences sufficient to be considered a final agency action. *Id.* at 536.

This lawsuit presents the exact opposite scenario. The Case Act explicitly "compels action by. . . the agency" by requiring State to publish covered agreements and instruments within a particular timeframe. *Valero*, 927 F.3d at 536. And, contrary to State's assertion, failure to comply with that obligation does "alter the relationship between the parties" by denying a "legal entitlement the Plaintiff carries under the Act," namely, timely access to Case Act materials. Defs.' Mem. at 17. Thus, State's noncompliance constitutes "final agency action" even under the standard applied by *Valero*. Moreover, under State's logic, the APA would never apply to any federal statute that mandates public disclosure of information because, in State's view, nondisclosure would

16

never have a legal effect that could constitute final agency action. This logic contradicts the plain language of the APA, which authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and it has been implicitly or explicitly rejected by every court that has sustained an APA claim based on an agency's failure to comply with a statutory disclosure obligation. *See, e.g.*, *Ctr. for Biological Diversity v. Tidwell*, 239 F. Supp. 3d 213, 228 (D.D.C. 2017) (sustaining an APA claim for failure to comply with statutory disclosure obligations).

### III.    Lawfare States an APA Claim for Failure to Comply with the Case Act

The Court should reject State's contentions that the APA does not provide a cause of action for its violations of the Case Act. Defs.' Mem. at 17. In support of this argument, State repeats its contention that a Case Act claim cannot survive in the absence of specific allegations of a formal, across-the-board policy of noncompliance with the Act. *Id.* at 17-18. As discussed herein, *supra* at 10, circuit precedent recognizes that the adoption of a formal agency policy is not a prerequisite to claims challenging an agency practice that impairs a plaintiff's lawful access to information. *CREW*, 846 F.3d at 1242; *accord Phang,* 2026 WL 1831251, at *7 (plaintiff "has a right of action under the APA" to challenge the government's compliance with a mandatory disclosure statute). The Complaint contains multiple allegations that State has failed to disclose covered agreements or instruments as part of a broader practice of noncompliance with Case Act's transparency provisions. *See, e.g.*, Compl. ¶¶ 86-88. These allegations, which are accepted as true, are sufficient to support an APA claim of noncompliance with the Case Act.

### IV.    Lawfare States an APA Claim for Unlawful Withholding or Unreasonable Delay

Next, State contends that Lawfare cannot sustain an APA claim for unlawful withholding or unreasonable delay because the Complaint contains "insufficient allegations" that State is actually withholding any Case Act material. Defs.' Mem. at 18. But the Complaint is replete with such allegations. *See* Compl. ¶¶ 9, 10, 91, 93 (citing examples of dozens of agreements and instruments that State has not disclosed within the statutory timeframe). Those allegations are sufficient to support a claim for unlawful withholding of agency action under the APA.

17

State also posits that, presuming the Complaint contains the necessary allegations of unlawful withholding (which it does), any delay in publication is not "unreasonable" given that State's delinquency can be gauged in terms of months rather than years. Defs.' Mem. at 19. In assessing this question, State encourages the Court to consider the six "*TRAC*" factors that apply to the unreasonable delay assessment. *Id.* (citing *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("*TRAC*").

As an initial matter, a court should not dismiss an unreasonable delay claim at the motion to dismiss stage if further proceedings would aid in the evaluation of the "actual reasons" for the delay. *Da Costa v. Immigr. Inv. Program Off.*, 643 F. Supp. 3d 1, 12 (D.D.C. 2022), *aff'd*, 80 F.4th 330 (D.C. Cir. 2023). Here, further proceedings will aid in properly evaluating the reasons for State's delay. For example, one *TRAC* factor concerns the potential existence of agency impropriety. In its Motion, State suggests that a potential reason for its delay in publication is that the EOP or other federal agencies have declined to comply with their statutory transmittal requirements. *See* Defs.' Mot. at 12-13. An agency violation of a statutory requirement would constitute impropriety, and the severity of that impropriety would be heightened if the violations were part of a larger strategy to shield covered agreements or instruments from public disclosure or congressional reporting. Further proceedings, including the potential for limited discovery, would aid in determining whether such impropriety exists.

Even if the Court were to assess the *TRAC* factors now, they counsel toward finding that a months-long delay in disclosing Case Act information is unreasonable. The six *TRAC* factors are:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*TRAC*, 750 F.2d at 80 (cleaned up).

Factors one and two are related, and, in assessing those factors, "if Congress has dictated how long a decision should take and the agency blows through that deadline, then that fact alone suggests unreasonableness." *Dib,* 2026 WL 1578859, at \*5. Here, Congress has established specific disclosure deadlines, and State concedes that the Complaint contains allegations of months-longs delays in complying with those deadlines. Defs.' Mem. at 20. "[T]hat fact alone suggests unreasonableness." *Dib,* 2026 WL 1578859, at \*5.

Although consideration of the remaining factors is likely unnecessary, those factors also counsel in favor of finding unreasonableness. Factors three and five overlap and are also often considered together. *See Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 118 (D.D.C. 2005). While human health and welfare are not at stake here, the interests prejudiced by the delays are extensive. As detailed above, *supra* at 3-5, the Case Act, and in particular the 2022 amendments, protect the role of Congress and the interests of the American people with respect to the manner in with the Executive Branch carries out U.S. foreign policy. The Act's transparency requirements prevent the Executive from concluding secret agreements and "provide a richer tapestry of information that allows for greater understanding of the use of international accords as a foreign policy tool" leading "to a stronger and more sustainable foreign policy." S. Comm. on Foreign Relations, *Enhancing Transparency on International Agreements and Non-Binding Instruments* 8. Allowing State to delay disclosure of this critical foreign policy information for months beyond the statutory disclosure deadlines substantially impairs these interests, preventing the public from assessing, analyzing, and reacting to pressing and time-sensitive foreign policy initiatives. *See Elec. Priv. Info. Ctr.*, 266 F. Supp. 3d at 319 ("the non-disclosure of information to which a plaintiff is entitled, under certain circumstances itself constitutes an irreparable harm; specifically, where the information is highly relevant to an ongoing and highly public matter").

With respect to the fourth factor, the effect of expediting delayed action on other agency priorities, State does not identify a single competing agency priority that would suffer if it were ordered to expedite its publications of overdue Case Act material. Defs.' Mem. at 20.

19

Finally, factor six considers whether impropriety may be "lurking behind" the delay. *TRAC*, 750 F.2d at 80. As alluded to above, State has already suggested that one issue "lurking behind" its delay is that other agencies or the EOP may have decided to violate their statutory transmittal requirements. Defs.' Mem. at 12-13. Such decisions, particularly if motivated by a desire to shield covered agreements and instruments from public scrutiny, would certainly constitute impropriety.

### V.    APA Claims Based on Violations of the Paperwork Reduction Act Are Permissible

Relying primarily on out-of-circuit precedent, State argues that an APA claim based on a violation of the Paperwork Reduction Act ("PRA") is "unavailable as a matter law" because the PRA does not provide an affirmative cause of action. Defs.' Mem. at 21. The D.C. Circuit has squarely rejected that argument. *See Steele v. United States*, 144 F.4th 316, 322–23 (D.C. Cir. 2025) ("[W]e hold that the PRA does not bar judicial review" of all APA claims alleging a PRA violation.). In upholding the availability of such a claim, the D.C. Circuit relied on the "'strong presumption that Congress intends judicial review of administrative action,' rebuttable only by 'clear and convincing evidence of a contrary legislative intent.'" *Id.* (citing *Amador Cnty. v. Salazar*, 640 F.3d 373, 379–80 (D.C. Cir. 2011)). Thus, under D.C. Circuit precedent, the PRA's lack of an affirmative cause of action is not a basis for dismissal of any APA claim that relies on PRA violations. *Id.* Numerous decisions in this district confirm that conclusion. *See, e.g.*, *CREW v. OMB*, 791 F. Supp. 3d 29, 55 (D.D.C. 2025) (granting plaintiff summary judgment on an APA claim asserting a violation of the PRA); *Drs. for Am. v. OPM*, 766 F. Supp. 3d 39, 51 (D.D.C. 2025) (holding that plaintiff had "established a substantial likelihood of success as to its PRA . . . claim" asserted under the APA); *Nat'l Women's L. Ctr. v. OMB*, 358 F. Supp. 3d 66, 90 n.8 (D.D.C. 2019), *appeal dismissed and remanded*, No. 19-5130, 2020 WL 13561758 (D.C. Cir. June 9, 2020) (sustaining a claim that agency action "violated the PRA").

State separately contends that, even if such a claim were sustainable, the Complaint lacks allegations that State has failed to abide by the PRA's directive that agencies "ensure that the public has timely and equitable access to the agency's public information." Defs.' Mem. at 22

20

(citing 44 U.S.C. § 3506(d)(1)). According to State, this directive is too "generic" and "broadly applicable" for a plaintiff to allege a violation. But, in this scenario, the PRA's supposedly "generic" timely-access mandate is fleshed out by the transparency requirements of the Case Act, which provides the specifics of what the public is entitled to in terms of "timely and equitable access to the agency's public information." 44 U.S.C. § 3506(d)(1). Moreover, the PRA defines "public information" as "any information . . . that an agency discloses, disseminates, or makes available to the public[.]" *Id.* § 3502(12). International agreements and instruments covered by the Case Act easily fall within this definition. *See* OMB, *Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies*; Republication, 67 Fed. Reg. 8452, 8460 (Feb. 22, 2002) (providing that a federal "information dissemination product" includes "any electronic document . . . or web page" that an agency disseminates to the public). Thus, because "[t]he PRA plainly requires the public dissemination of an agency's public information," *CREW*, 791 F. Supp. 3d at 46 (cleaned up), State's failure to disseminate Case Act material violates the PRA's mandate.

## VI.    Absent Other Relief, Lawfare Is Entitled to a Writ of Mandamus

State's challenge to Lawfare's claim for mandamus relief rests entirely on the same arguments that State advanced in challenging Lawfare's APA claims. *See* Defs.' Mem. at 22-23. For the reasons stated above, Lawfare has stated cognizable challenges to State's noncompliance with its disclosure requirements, and the Court has jurisdiction to entertain those challenges. Accordingly, because federal law imposes on State a "clear duty to act," mandamus relief would be warranted to "correct [a] transparent violation[]" of that duty if no other adequate means of redress are available. *See In re Aiken Cnty.*, 725 F.3d 255, 258 (D.C. Cir. 2013).

## CONCLUSION

The Court should deny Defendants' Motion to Dismiss.

Date: June 29, 2026

Respectfully Submitted,

*/s/ Stephen J. Buckingham*
Stephen J. Buckingham (D.C. Bar No. 1672753)
Nikhel S. Sus (D.C. Bar No. 1017937)
CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
sbuckingham@citizensforethics.org
nsus@citizensforethics.org

*Counsel for Plaintiff*

22